1

ROSHKA DEWULF & PATTEN, PLC

2  ONE ARIZONA CENTER
   400 EAST VAN BUREN STREET
3  SUITE 800
   PHOENIX, ARIZONA 85004
4  TELEPHONE NO 602-256-6100
   FACSIMILE 602-256-6800
   dewulf@rdp-law.com
5  jstevens@rdp-law.com

6  Name and State Bar No.:    John E. DeWulf/#006850
                              Jennifer A. Stevens/#024655
7

8  Attorneys for Defendant Seattle Genetics, Inc.

9              **IN THE UNITED STATES DISTRICT COURT**

10              **FOR THE DISTRICT OF ARIZONA**

11

12  | The Arizona Board of Regents for and on behalf of Arizona State University, | No. 2:14-CV-00653-JWS |
    |---|---|

13  |  Plaintiff, | **DEFENDANT AND COUNTERCLAIMANT SEATTLE** |

14  | vs. | **GENETICS, INC.'S ANSWER TO PLAINTIFF THE ARIZONA BOARD OF REGENTS FOR AND ON** |

15  | Seattle Genetics, Inc., a Delaware corporation, | **BEHALF OF ARIZONA STATE UNIVERSITY'S COMPLAINT FOR** |

16  |  | **INFRINGEMENT OF U.S. PATENT** |

17  |  Defendant. | **NO. 5,635,483 AND COUNTERCLAIM** |

18  |  | **DEMAND FOR JURY TRIAL** |

19

20  | Seattle Genetics, Inc., a Delaware corporation, |

21  |  Counterclaimant, |

22  | vs. |

23  | The Arizona Board of Regents for and on behalf of Arizona State University, |

24  |  Counterdefendant. |

25

26

27

Defendant and Counterclaimant Seattle Genetics, Inc. ("SeaGen"), by and through its undersigned counsel, answers the Complaint of Plaintiff, The Arizona Board of Regents for and on behalf of Arizona State University (collectively, "ASU"), as follows:

**Introduction**

1.      SeaGen is without sufficient information or belief to admit or deny the allegations in this paragraph and, on that basis, denies the allegations of paragraph 1.

2.      SeaGen admits that Dolastatin 10 is an extremely toxic molecule that readily kills both cancer cells and normal cells, and despite multiple clinical trials has never been proven efficacious or approved by the FDA as safe and effective for the treatment of cancer in humans. SeaGen is without sufficient information or belief to admit or deny the allegations in this paragraph and, on that basis, denies the allegations of paragraph 2.

3.      SeaGen admits that, on its face, U.S. Patent No. 5,635,483 (the "'483 patent") is titled "Tumor Inhibiting Tetrapeptide Bearing Modified Phenethyl Amides," was issued on June 3, 1997, and claims certain chemical compounds among which is a compound known colloquially as Auristatin E.  SeaGen is without sufficient information or belief to admit or deny the remaining allegations in this paragraph and, on that basis, denies the remaining allegations of paragraph 3.

4.      SeaGen admits that it has made, markets, offers to sell and sells a Food and Drug Administration ("FDA") approved antibody drug conjugate ("ADC"), brentuximab vedotin, under the brand name ADCETRIS®.  SeaGen admits that ADCETRIS utilizes a chemical compound known as Monomethyl Auristatin E ("MMAE") as a cytotoxic agent. SeaGen denies that ADCETRIS and/or MMAE infringe the '483 patent.  Indeed, as acknowledged later in ASU's Complaint, MMAE is different from the chemical compounds claimed in the '483 patent.  Moreover, SeaGen has a license to all relevant compounds claimed in the '483 patent.  Therefore, SeaGen cannot infringe the '483 patent.  SeaGen denies the remaining allegations of paragraph 4.

**ROSHKA DeWULF & PATTEN, PLC**
ONE ARIZONA CENTER
400 EAST VAN BUREN – SUITE 800
PHOENIX, ARIZONA 85004
TELEPHONE NO. 602-256-6100
FACSIMILE 602-256-6800

2

ROSHKA DEWULF & PATTEN, PLC
ONE ARIZONA CENTER
400 EAST VAN BUREN - SUITE 800
PHOENIX, ARIZONA 85004
TELEPHONE NO. 602-256-6100
FACSIMILE 602-256-6800

**Parties, Jurisdiction and Venue**

5.      The allegations of Paragraph 5 state legal conclusions to which no response is required.  To the extent a response is deemed to be required, SeaGen admits that A.R.S. § 15-1625 names the Arizona Board of Regents as a "body corporate" with "jurisdiction and control over the universities."  SeaGen denies the remaining allegations of paragraph 5.

6.      SeaGen admits that it is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 21823 – 30th Drive S.E., Bothell, WA 98021.

7.      The allegations of Paragraph 7 state a legal conclusion to which no response is required.  To the extent a response is deemed to be required, SeaGen admits that the Complaint purports to be an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq* and that ASU purports to base subject matter jurisdiction under 28 U.S.C. §§1331 and 1338.  SeaGen denies that any valid claim for patent infringement has been asserted by ASU.

8.      SeaGen admits that it is registered to conduct business in Arizona, and sells and/or offers to sell ADCETRIS within this district.  SeaGen denies the remaining allegations of paragraph 8 including, in particular, that SeaGen has infringed the '483 patent.

9.      SeaGen admits that it entered a license with ASU under which it has the exclusive right to use the relevant chemical compounds claimed by the '483 patent.  SeaGen further admits that in 2004 ASU, through its licensing arm, Arizona Science and Technology Enterprises, LLC ("AzTE"), entered a written amendment to that license in which ASU acknowledged that MMAE is *not* one of the relevant compounds claimed in the '483 patent.  Consequently, SeaGen does not infringe the '483 patent.  SeaGen admits that the Court has personal jurisdiction over SeaGen with regard to the subject matter of the present suit.  SeaGen denies that it has committed any acts of infringement.  SeaGen denies the remaining allegations of paragraph 9.

3

10.     SeaGen denies that venue is proper pursuant to 28 U.S.C. §1391(b)(2) and denies that a substantial part of the events or omissions giving rise to ASU's claims occurred in this district.

## Summary of the Controversy

11.     SeaGen admits that Auristatin E is an extremely toxic molecule but denies that Auristatin E is a powerful anticancer drug as it has never been tested as an anticancer drug in humans, has never been proven to be effective in killing cancer cells in humans and has never been approved by the FDA as a safe and effective treatment of cancer in humans. SeaGen is without sufficient information or belief to admit or deny the remaining allegations in the first two sentences of this paragraph 11 and, on that basis, denies those allegations.  SeaGen admits that ASU granted to SeaGen a license to the relevant compounds claimed in the '483 patent.  That license remains in force and effect.

12.     SeaGen admits that its product, ADCETRIS, utilizes MMAE as the cytotoxic agent, that SeaGen created this agent (also referred to herein as a compound), and that it is different from the compounds claimed in the '483 patent.  SeaGen admits it claims MMAE and ADCETRIS do not infringe the '483 patent and further avers that ASU, through its licensing arm AzTE  agreed in writing in a license amendment entered in 2004 that MMAE is not one of the compounds claimed in the '483 patent.  SeaGen denies any other allegations in paragraph 12.

13.     SeaGen is without sufficient information or belief to admit or deny the allegations in this paragraph, and, on that basis, denies the allegations of paragraph 13.

14.     SeaGen denies that Dolastatin 10 is a promising anticancer drug or suitable for treating cancer as Dolastatin 10 is an extremely toxic molecule that readily kills both cancer cells and normal cells, and that despite multiple clinical trials, Dolastatin 10 has never been proven efficacious or approved by the FDA as safe and effective for the treatment of cancer in humans. SeaGen is without sufficient information or belief to admit or deny the remaining allegations in this paragraph and, on that basis, denies those allegations.

ROSHKA DeWULF & PATTEN, PLC
ONE ARIZONA CENTER
400 EAST VAN BUREN – SUITE  800
PHOENIX, ARIZONA 85004
TELEPHONE NO. 602-256-6100
FACSIMILE 602-256-6800

15.     SeaGen admits that Dr. Pettit worked to synthesize Dolastatin 10 and some Auristatins.  SeaGen is without sufficient information or belief to admit or deny the remaining allegations in this paragraph and, on that basis, denies those allegations.

16.     SeaGen admits that certain formulations of Auristatin E can be a potent cytotoxic agent capable of indiscriminately killing both cancer cells and normal cells, but it has never been approved by the FDA as a safe and effective treatment of cancer in humans. SeaGen admits that the diagram in paragraph 16 appears to represent the chemical structure of Auristatin E (if the red circle superimposed on the diagram is ignored).  SeaGen avers that the chemical structure of Auristatin E is:

**Auristatin E**



SeaGen denies the remaining allegations in paragraph 16.

17.     SeaGen admits that normal cells in the human body contain chromosomes and that chromosomes contain genetic information.  SeaGen admits that genetic information in a cell is replicated during cell division and that, generally speaking, chromosomes must be replicated to each daughter cell for that cell to receive complete genetic information. SeaGen denies the remaining allegations of paragraph 17.

18.     SeaGen admits that cellular structures known as microtubules exist and that, generally speaking and among other things, they physically separate each set of chromosomes when they replicate.  SeaGen further admits, again generally speaking and dependent on other factors, that when normal cell division is complete each daughter cell may have a complete set of chromosomes or genetic information.  SeaGen denies the remaining allegations of paragraph 18.

5

ROSHKA DeWulf & PATTEN, PLC
ONE ARIZONA CENTER
400 EAST VAN BUREN – SUITE 800
PHOENIX, ARIZONA 85004
TELEPHONE NO 602-256-6100
FACSIMILE 602-256-6800

19.    SeaGen admits that cancer cells may divide rapidly and that some cancer cells form tumors.  SeaGen admits that some treatments for cancer use cytotoxic chemicals. SeaGen denies the remaining allegations of paragraph 19.

20.    SeaGen admits that Auristatin E is a toxic molecule that inhibits the growth of cancer cells as well as normal cells in animal models by disrupting microtubules.  Because of the vagueness of the allegations, SeaGen is without sufficient information or belief to admit or deny the remaining allegations in this paragraph and, on that basis, denies those allegations

21.    SeaGen admits that one of the things necessary to have properly-functioning microtubules is that they be able to form by polymerization of tubulin.  SeaGen denies the remaining allegations of paragraph 21.

22.    SeaGen admits that if a cell goes through a process known as apoptosis, then the cell may die.  SeaGen is without sufficient information or belief to admit or deny whether when Auristatin E binds to tubulin, the tubulin protein cannot polymerize and whether this causes the events described in paragraph 22 and, on that basis, denies the allegations.

23.    SeaGen admits that, on its face, U.S. Patent No. 5,635,483 (the "'483 patent") is titled "Tumor Inhibiting Tetrapeptide Bearing Modified Phenethyl Amides," was filed on December 3, 1992 and issued on June 3, 1997 and claims, among other things, a certain compound called Auristatin E as well as other auristatins.  SeaGen is without sufficient information or belief to admit or deny the remaining allegations in this paragraph and, on that basis, denies the remaining allegations of paragraph 23.

24.    SeaGen admits that it has been developing Antibody-Drug Conjugates ("ADCs") since 1998, and admits that some of its ADCs are designed to target cancerous cells.  SeaGen admits that it first approached Dr. George Pettit of ASU later in 1998 and suggested the possibility of using auristatins as cytotoxic agents in ADC development. SeaGen denies the remaining allegations of paragraph 24.

25.    SeaGen admits that Dr. Peter Senter and Dr. Pettit corresponded in August, 1998.  SeaGen admits that Auristatin E was one of the molecules discussed between Dr. Senter and Dr. Pettit in 1999.  SeaGen admits that it received a copy of the '483 patent and certain reagents in 1999 and/or 2000.  SeaGen denies ASU's characterization of the correspondence and denies the remaining allegations of paragraph 25.

26.    SeaGen admits that before entering the license agreement with ASU, SeaGen and ASU entered a secrecy agreement.  SeaGen admits that ASU subsequently provided some information to SeaGen.  SeaGen denies the remaining allegations of paragraph 26.

27.    SeaGen admits that ASU granted SeaGen a license on February 3, 2000 (the "License").  The License speaks for itself and in it  "ASU's Patent Rights" that are exclusively licensed to SeaGen are stated as follows:

"ASU's PATENT RIGHTS" shall mean patent rights to certain subject matter, which is included in the following:

Under ASU Case No. 651:
U.S. Patent No. 5,635,483 entitled "Tumor Inhibiting Tetrapeptide Bearing Modified Phenethyl Amides".

For the purposes of this Agreement, only those compounds taught in the above named patent and identified as stereoisomers of a compound commonly referred to as "Auristatin E" are included in this license and the grant of rights described in Article 2 of this Agreement shall pertain only to the following:

ROSHKA DeWULF & PATTEN, PLC
ONE ARIZONA CENTER
400 EAST VAN BUREN - SUITE 800
PHOENIX, ARIZONA 85004
TELEPHONE NO. 602-256-6100
FACSIMILE 602-256-6800

7

ROSHKA DeWulf & Patten, PLC
ONE ARIZONA CENTER
400 EAST VAN BUREN - SUITE 800
PHOENIX, ARIZONA 85004
TELEPHONE NO. 602-256-6100
FACSIMILE 602-256-6800

Auristatin E, Compound No. 1S2R
Auristatin E, Compound No. 1R2R
Auristatin E, Compound No. 1S2S
Auristatin E, Compound No. 1R2S

Each of which falls within the general structure shown below:



and any corresponding extensions or foreign applications or patents.

SeaGen denies the remaining allegations of paragraph 27.

28.     SeaGen admits that the '483 patent, in claims not asserted against SeaGen here, claims a number of methods and compounds beyond the Auristatin E stereoisomers listed above.  SeaGen denies the remaining allegations of paragraph 28.

29.     SeaGen admits that it is required under the License to submit reports.  SeaGen denies the remaining allegations of paragraph 29.

30.     SeaGen admits that its drug product, ADCETRIS, utilizes MMAE as a cytotoxic agent, that MMAE was developed by SeaGen scientists and that this compound differs from the compounds claimed in the '483 patent.  SeaGen denies the remaining allegations of paragraph 30.

31.     To the extent ASU is alleging that SeaGen breached the License, SeaGen denies those allegations and notes that ASU's prior allegations of breach were raised before a panel of the American Arbitration Association and were dismissed with prejudice. SeaGen denies the remaining allegations of paragraph 31.

32.     SeaGen admits that in early 2004, and before then, SeaGen told ASU that SeaGen was developing an ADC using MMAE.  SeaGen further admits that it and ASU

agreed to amend, and did amend, the 2000 License in August 2004 ("Amendment No. 3"). Amendment No. 3 states, among other things, that:

> **ASU acknowledges and agrees that ASU's PATENT RIGHTS do not cover (a) MMAE**, MMAF and AFP (each as defined in Exhibit A [which provides pictures of each of the three compounds]); and (b) any prodrug forms of MMAE, MMAF and AFP (collectively, "SGI COMPOUNDS"). ASU acknowledges and agrees that the LICENSEE **will not pay ASU any milestones or royalties with respect to products utilizing or incorporating SGI COMPOUNDS** or any variants, analogues or derivatives thereof (collectively, "INDEPENDENT PRODUCTS"). (Emphasis added).

SeaGen denies the remaining allegations of paragraph 32.

33.     SeaGen admits that ADCETRIS (an ADC containing MMAE) was approved by the FDA to treat relapsed Hodgkin lymphoma and relapsed systemic anaplastic large cell lymphoma (sALCL) on August 19, 2011, and that SeaGen has marketed ADCETRIS for use in treating these life-threatening diseases. SeaGen denies that it has committed any act of infringement. SeaGen denies the remaining allegations of paragraph 33.

34.     SeaGen admits that Dr. Brian Toki, Medical Science Liaison for SeaGen, and a former student of Dr. Pettit, wrote an email to Dr. Pettit on March 4, 2011 which stated, among other things,

> "Bob, …[t]here is no question that the company would not be as successful if we didn't collaborate with you over ten years ago on the dolastatins…It has been an amazing journey and I want to personally thank you for getting me into this position to witness the evolution of something very special. Rarely does one stay with the same company in such a volatile biotech world. I have been very fortunate to say the least.

SeaGen denies the remaining allegations of paragraph 34.

35.     SeaGen admits that one of its scientists previously testified, with respect to the '483 patent, that "I regarded this as a patent – a valid patent. And in order to have a valid patent, it would have to be novel." SeaGen further admits that one of its scientists considers the work that Professor Pettit did concerning Auristatin E to be "important." SeaGen denies the remaining allegations of paragraph 35.

**ROSHKA DeWULF & PATTEN, PLC**
ONE ARIZONA CENTER
400 EAST VAN BUREN - SUITE 800
PHOENIX, ARIZONA 85004
TELEPHONE NO. 602-256-6100
FACSIMILE 602-256-6800

36.     SeaGen admits that the figures in paragraph 36, excluding the red circles superimposed on the diagrams, generally depict the chemical structures of Auristatin E and MMAE; SeaGen avers that the respective chemical structures of Auristatin E and MMAE are:

**Auristatin E**



**MMAE**



 SeaGen denies the remaining allegations of paragraph 36.

37.     SeaGen denies the allegations of paragraph 37.

38.     SeaGen admits that Dr. Brian Toki testified that "sitting here today" he was "not aware of any differences in mechanisms of action" "in free drugs" between Auristatin E and MMAE.  SeaGen denies the remaining allegations of paragraph 38.

39.     SeaGen denies the allegations of paragraph 39.

40.     SeaGen denies the allegations of paragraph 40.

41.     SeaGen admits that ADCETRIS is an ADC which utilizes MMAE as a cytotoxic agent and that the images in paragraph 41 appear to be images taken from SeaGen's website.  SeaGen denies the remaining allegations of paragraph 41.

ROSHKA DeWULF & PATTEN, PLC
ONE ARIZONA CENTER
400 EAST VAN BUREN – SUITE 800
PHOENIX, ARIZONA 85004
TELEPHONE NO. 602-256-6100
FACSIMILE 602-256-6800

42.     SeaGen admits that ADCETRIS was approved by the FDA to treat relapsed Hodgkin lymphoma and relapsed systemic anaplastic large cell lymphoma (sALCL) on August 19, 2011.  SeaGen admits that ADCETRIS is sold in the United States for use in treating these life-threatening diseases.  SeaGen admits that net product sales of ADCETRIS have exceeded $300 million.  SeaGen denies the remaining allegations of paragraph 42.

**Claim for Infringement of U.S. Patent No. 5,635,483**

43.     SeaGen incorporates by reference its responses to the preceding paragraphs as though fully set forth here.

44.     SeaGen admits that, on its face, U.S. Patent No. 5,635,483 (the "'483 patent") is titled "Tumor Inhibiting Tetrapeptide Bearing Modified Phenethyl Amides" and dated June 3, 1997.  SeaGen denies that it has committed any act of infringement or induced or contributed to the infringement of others.  SeaGen denies the remaining allegations of paragraph 44.

45.     SeaGen denies the allegations of paragraph 45.

46.     SeaGen denies the allegations of paragraph 46.

47.     SeaGen admits that it has been aware of the '483 patent.  SeaGen denies the remaining allegations of paragraph 47.

48.     SeaGen denies the allegations of paragraph 48.

**RESPONSE TO PLAINTIFF ASU'S PRAYER FOR RELIEF**

SeaGen denies that ASU is entitled to any of the relief it seeks in this action.  SeaGen does not infringe and has not infringed, directly or indirectly, literally or under the doctrine of equivalents, any valid and enforceable claims of the '483 patent.  As acknowledged in ASU's Complaint, MMAE is different from the chemical compounds claimed in the '483 patent.  Moreover, SeaGen has a license to all relevant compounds claimed in the '483 patent.  Additionally, with regard to ADCETRIS, ASU has explicitly agreed in writing that SeaGen "will not pay ASU any milestones or royalties with respect to products utilizing or incorporating" MMAE.   Therefore, SeaGen cannot infringe the '483 patent and cannot be

ROSHKA DeWULF & PATTEN, PLC
ONE ARIZONA CENTER
400 EAST VAN BUREN - SUITE 800
PHOENIX, ARIZONA 85004
TELEPHONE NO. 602-256-6100
FACSIMILE 602-256-6800

liable to ASU for any damages.  ASU's prayer for relief should be denied with prejudice in its entirety.

## AFFIRMATIVE DEFENSES

SeaGen asserts the following affirmative defenses without undertaking or otherwise shifting any applicable burdens of proof.  SeaGen reserves the right to assert additional defenses as warranted by facts revealed through investigation and discovery.

## FIRST AFFIRMATIVE DEFENSE

### Non-infringement

49.   ASU is barred from obtaining any relief sought in the Complaint because SeaGen has not infringed any valid and enforceable claim of the '483 patent, either literally or under the doctrine of equivalents, nor has SeaGen actively induced or contributed to any infringement of the '483 patent.

50.   SeaGen incorporates by reference all preceding paragraphs as though fully set forth herein.

51.   Neither MMAE nor ADCETRIS is claimed by the '483 patent.

52.   Auristatin E is never made during the manufacture of ADCETRIS, Auristatin E is not released during the lifecycle of ADCETRIS, and Auristatin E is not a metabolite of MMAE in the human body.  The differences between MMAE and Auristatin E are substantial, and these compounds are not recognized as being interchangeable.  Further, the differences between ADCETRIS and Auristatin E are substantial, and these compounds are also not recognized as being interchangeable.

53.   Neither MMAE nor ADCETRIS is used in a method of inhibiting the growth of cancer cells selected from the group of cell lines consisting of P388, OVCAR-3, SF295, A498, NCI-460, or KM20L2, as claimed in Claim 4 of the '483 patent.

. . .

. . .

ROSHKA DEWULF & PATTEN, PLC
ONE ARIZONA CENTER
400 EAST VAN BUREN – SUITE  800
PHOENIX, ARIZONA 85004
TELEPHONE NO 602-256-6100
FACSIMILE 602-256-6800

ROSHKA DEWULF & PATTEN, PLC
ONE ARIZONA CENTER
400 EAST VAN BUREN – SUITE 800
PHOENIX, ARIZONA 85004
TELEPHONE NO. 602-256-6100
FACSIMILE 602-256-6800

## SECOND AFFIRMATIVE DEFENSE

### Prosecution History Estoppel

54.　　ASU's claims for alleged infringement are barred by the doctrine of prosecution history estoppel.  Those involved in the prosecution of application no. 07/985,827 (the "'827 application") that led to the '483 patent, acting on behalf of ASU and with its authorization, have taken certain positions or done certain acts before the United States Patent and Trademark Office ("PTO") during the prosecution of the '483 patent that estop or preclude ASU from contending that SeaGen has infringed any claims of the '483 patent.

55.　　SeaGen incorporates by reference all preceding paragraphs as though fully set forth herein.

56.　　During prosecution, the PTO rejected all claims of the '483 patent on October 25, 1993 for failure to meet the requirement of the first paragraph of 35 U.S.C. § 112: "The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."

57.　　On March 29, 1994, in its Brief on Appeal submitted to the Board of Patent Appeals, ASU argued against this rejection by limiting its claims to the compounds (6a-6k) it had purportedly synthesized and tested for biological activity:  "[Issued Claims 1-8] are expressly limited to compounds 6a-6k."  ASU further asserted that "Applicants have specifically limited their claims to compounds and methods that are effective against those cancers for which applicants have *in vitro* human and *in vivo* animal data."  At the time of this representation ASU did not have any *in vitro* human or *in vivo* animal data for MMAE or ADCETRIS.

58.     Based upon these affirmative representations by ASU the Board of Patent Appeals ordered that the claims as specifically limited by ASU be allowed.

59.     In light of ASU's unambiguous assertions made to the PTO during prosecution, and the PTO's reliance on those representations, ASU may not now expand the scope of its claims to recapture matter it previously surrendered.

### THIRD AFFIRMATIVE DEFENSE

### (Express License)

60.     ASU's claims of infringement are barred due to an express license to SeaGen.

61.     SeaGen incorporates by reference all preceding paragraphs as though fully set forth herein.

62.     On February 3, 2000, SeaGen entered into License Agreement  No. 651-01.LIC ("the License") with the Arizona Board of Regents acting on behalf of ASU.  A true and correct, redacted copy of the 2000 License is attached as Exhibit A and incorporated herein by reference.  The License specifically grants to SeaGen the exclusive right to the following:

"ASU's PATENT RIGHTS" shall mean patent rights to certain subject matter, which is included in the following:

Under ASU Case No. 651:
U.S. Patent No. 5,635,483 entitled "Tumor Inhibiting Tetrapeptide Bearing Modified Phenethyl Amides".

For the purposes of this Agreement, only those compounds taught in the above named patent and identified as stereoisomers of a compound commonly referred to as "Auristatin E" are included in this license and the grant of rights described in Article 2 of this Agreement shall pertain only to the following:

ROSHKA DeWULF & PATTEN, PLC
ONE ARIZONA CENTER
400 EAST VAN BUREN - SUITE  800
PHOENIX, ARIZONA 85004
TELEPHONE NO 602-256-6100
FACSIMILE 602-256-6800

ROSHKA DeWULF & PATTEN, PLC
ONE ARIZONA CENTER
400 EAST VAN BUREN - SUITE 800
PHOENIX, ARIZONA 85004
TELEPHONE NO. 602-256-6100
FACSIMILE 602-256-6800

Auristatin E, Compound No. 1S2R
Auristatin E, Compound No. 1R2R
Auristatin E, Compound No. 1S2S
Auristatin E, Compound No. 1R2S

Each of which falls within the general structure shown below:



Dav-Val-Dil-Dap-NH ⟋⟍ OH

and any corresponding extensions or foreign applications or patents.

63. Auristatin E is a synthetic variant of Dolastatin 10, a compound that exists in nature and which is effective in killing cells in the laboratory but is too toxic for use as a therapeutic agent in patients. ASU and others have worked on Dolastatin 10 and related compounds, including auristatins, for over forty years but have been unsuccessful in developing any of them as a therapeutic product.

64. At the time it entered the License, SeaGen was searching for a cytotoxic compound to link, or conjugate, to a monoclonal antibody to create an antibody-drug conjugate ("ADC"). Since antibodies target antigens in the human body, an ADC can target particular diseases. However, for an ADC to work, the drug must remain linked to the antibody until it reaches the target, then release from the antibody while retaining its potency, and attack the disease. In early 2000, there were several ADCs in clinical trials by pharmaceutical and biotechnology companies, but none had yet received regulatory approval. Currently, fourteen years later, SeaGen's ADCETRIS is one of only two FDA-approved antibody-drug conjugates in the United States.

65. After signing the License, ASU only provided very limited amounts of Auristatin E for testing at Seattle Genetics. Consequently, SeaGen's research team, led by

15

Dr. Peter Senter, had to independently develop methods of making Auristatin E and its components by studying publicly-available scientific literature and conducting internal research and process development experiments. Several laboratories throughout the world had published methods of making Dolastatin 10 and its components. Selecting from among these methods, and making their own improvements thereon, SeaGen scientists crafted their method of making Auristatin E and its components.

66.     SeaGen conducted extensive testing to determine whether Auristatin E demonstrated promise for incorporation into an ADC. Unfortunately, SeaGen found that when Auristatin E was conjugated to an antibody the resulting ADC was unstable, was unlikely to be effectively delivered to cancer cells and so was not suitable for use in clinical testing. SeaGen disclosed these difficulties to ASU in order to keep ASU informed of SeaGen's development efforts and SeaGen also published its work at scientific meetings.

67.     The failure of ASU's Auristatin E to work as an antibody-drug conjugate forced SeaGen to look for a different solution. Because Dr. Senter's team had independently developed methods of making the components of Auristatin E, it was also able to create and test new and different compounds that differed from Dolastatin 10 and Auristatin E. One of those new compounds was Monomethyl Auristatin E ("MMAE"). SeaGen discovered that MMAE, unlike Auristatin E, could be utilized as part of an ADC because its different chemical structure meant that it could be both stably linked to an antibody and later effectively separated from that antibody once inside a cancer cell. SeaGen concluded from these experiments that MMAE-based ADCs should be further developed as clinical candidates. This work was done without any assistance from ASU.

68.     SeaGen filed its first patent application on MMAE on April 30, 2001. It was published in November, 2002. A continuation-in-part of this application has matured into U.S. Patent 6,884,869. A second, related, patent application was published in February, 2004. Three other U.S. patents in the same family have now issued. These patents and

ROSHKA DeWULF & PATTEN, PLC
ONE ARIZONA CENTER
400 EAST VAN BUREN - SUITE  800
PHOENIX, ARIZONA 85004
TELEPHONE NO. 602-256-6100
FACSIMILE 602-256-6800

published applications publicly disclosed SeaGen's new methods of making MMAE and its components.

69.     On or about October 8, 2001, SeaGen submitted a progress report to ASU stating that Auristatin E "does not appear to have an appropriate therapeutic window on its own to consider it for development" and the Auristatin E-based ADCs SeaGen was developing did not yet have "stability that results in an appropriate therapeutic window for development and ultimately clinical trials."

70.     In June, 2002, SeaGen again informed ASU that the Auristatin E compounds licensed under the 2000 License did not appear suitable for conjugation to antibodies because the resulting ADCs were unstable.  SeaGen also informed ASU that its scientists had independently developed new compounds that showed more promise.

71.     In 2003 SeaGen sent ASU a reprint of SeaGen's first publication on the technology SeaGen developed, published in Nature Biotechnology, "Development of potent monoclonal antibody auristatin conjugates for cancer therapy," Doronina, *et al. Nature Biotech.* (2003) 21 (7): 778-784 ("SeaGen's 2003 MMAE publication").  A true and correct copy SeaGen's 2003 MMAE publication is attached as Exhibit B.  This publication describes the work SeaGen undertook to make Auristatin E-based ADCs and MMAE-based ADCs and compares the Auristatin E-based ADC and MMAE-based ADCs in *in vitro* and *in vivo* studies.  It clearly "describe[s] the *in vitro* and *in vivo* properties of monoclonal antibody-drug conjugates consisting of the potent synthetic dolastatin 10 analogs auristatin E (AE) and monomethylauristatin E (MMAE)," linked to monoclonal antibodies ("mAbs"). *Id*.  The publication further describes how ADCs made with MMAE were "much more stable in buffers and plasma" than the ADC made with Auristatin E, and that one of the MMAE ADCs exhibited greater *in vitro* specificity and lower *in vivo* toxicity than corresponding hydrazone conjugates made with Auristatin E.  *Id*.  In essence, it demonstrates that the MMAE-based ADCs were more promising therapeutic candidates than the Auristatin E-based ADCs and emphasizes "the importance of linker technology,

ROSHKA DEWULF & PATTEN, PLC
ONE ARIZONA CENTER
400 EAST VAN BUREN – SUITE 800
PHOENIX, ARIZONA 85004
TELEPHONE NO. 602-256-6100
FACSIMILE 602-256-6800

drug potency and conjugation methodology in developing safe and efficacious [ADCs] for cancer therapy." *Id.* This publication gave ASU details of SeaGen's experiments and specifically informed ASU that the Auristatin E-based ADCs presented problems with respect to specificity and toxicity and that SeaGen was pursuing a more promising cytotoxic agent, MMAE.

72.     By early 2004, SeaGen was considering terminating the License because MMAE (and other Auristatins that SeaGen had developed independently) was not covered by the '483 patent and because it was unlikely that SeaGen would develop a clinical product utilizing any of ASU's Auristatin E stereoisomers. Therefore, SeaGen and ASU engaged in new negotiations concerning the License. During these discussions, SeaGen again advised ASU of the discoveries SeaGen had made during its own research and development work on new compounds, including MMAE, and SeaGen's belief that these new compounds were not covered by the '483 patent. Attached as Exhibit C are true and correct, redacted copies of correspondence between SeaGen and ASU's licensing arm, AzTE, in 2004. These negotiations lasted for more than three months and included ASU and its attorneys, including outside patent counsel.

73.     Instead of terminating the License, the parties agreed to amend it. A true and correct, redacted copy of the amendment ("Amendment No. 3") is attached as Exhibit D and incorporated herein by reference. At the time, since there was substantial uncertainty whether any ADCs incorporating ASU's Auristatin E would ever overcome the many clinical and regulatory hurdles necessary to become an approved drug, ASU elected to renegotiate the terms of the License to receive increased guaranteed annual compensation instead of terminating the license. In Amendment No. 3, ASU, through its licensing arm, and SeaGen agreed that ASU's patent rights did *not* cover SeaGen's proprietary new compounds, including (i) MMAE, MMAF and AFP; and (ii) any prodrug forms of MMAE, MMAF and AFP (collectively, "SGI COMPOUNDS"). (*See,* Ex. D, ¶ 1).

**Roshka DeWulf & Patten, PLC**
ONE ARIZONA CENTER
400 EAST VAN BUREN – SUITE 800
PHOENIX, ARIZONA 85004
TELEPHONE NO. 602-256-6100
FACSIMILE 602-256-6800

74.     ASU's claim that MMAE and/or ADCETRIS infringe the '483 patent is barred by the License and Amendment No. 3.  Either MMAE is different from the stereoisomers of Auristatin E as recited in Amendment No. 3, in which case it does not infringe the '483 patent, or it is the equivalent of one or more of those isomers, in which case it is licensed pursuant to the License.

75.     ASU acknowledged and agreed in 2004 in Amendment No. 3 that SeaGen would not have any obligation to pay ASU any milestones or royalties with respect to products utilizing or incorporating SGI COMPOUNDS, including ADCs incorporating MMAE.  In consideration of the clarifying amendment and acknowledgement from ASU, SeaGen agreed to pay ASU a one-time fee and additional predetermined annual maintenance fees thereafter until the expiration of the '483 patent.  SeaGen has made, and ASU has accepted, all payments due.

76.     After completing Amendment No. 3 SeaGen continued to work diligently, spending hundreds of millions of dollars, to develop ADCETRIS, including several more years of research and development and then many years in clinical trials.

77.     SeaGen confirmed its activities and its understanding of Amendment No. 3 with ASU several times, including on March 7, 2005 when Eric Dobmeier, then SVP, Corporate Development & General Counsel for SeaGen, emailed to ASU's licensing arm, AzTE, an excerpt of SeaGen's upcoming March 15, 2005 Annual Report for AzTE's review.  The excerpt stated:

> *"Arizona State University.* In February 2000, we entered into a license agreement with Arizona State University for a worldwide, exclusive license to the cell-killing agent Auristatin E.  We subsequently amended this agreement in August 2004.  Under the terms of the amended agreement, we are required to pay annual maintenance fees to Arizona State University until expiration of their patents covering Auristatin E.  We are not, however, required to pay any progress-dependent milestone payments or royalties on net sales of products incorporating the Auristatin derivatives currently used in our ADC technology, and thus we do not expect to pay any milestones or royalties to Arizona State University with respect to products employing our current ADC technology."

ROSHKA DeWULF & PATTEN, PLC
ONE ARIZONA CENTER
400 EAST VAN BUREN - SUITE 800
PHOENIX, ARIZONA 85004
TELEPHONE NO. 602-256-6100
FACSIMILE 602-256-6800

ROSHKA DeWULF & PATTEN, PLC
ONE ARIZONA CENTER
400 EAST VAN BUREN – SUITE  800
PHOENIX, ARIZONA 85004
TELEPHONE NO. 602-256-6100
FACSIMILE 602-256-6800

ASU did not object.  A true and correct copy of this March 7, 2005 email is attached

as Exhibit E.  This language was then filed verbatim in SeaGen's Annual Report and Form

10-K, a publicly available document.  A true and correct copy of SeaGen's March 15, 2005

Annual Report is attached as Exhibit F.  Similarly, SeaGen reminded ASU, through its

licensing arm, AzTE, of SeaGen's current activities and the terms of Amendment No. 3 on

August 21, 2008:

> Just to clarify, Seattle Genetics is not currently selling any products utilizing ASU's
> technology.  Also, our agreement with ASU was amended on August 17, 2004 to
> provide that Seattle Genetics will not owe any royalties to ASU for products utilizing
> MMAE, MMAF or any derivatives thereof, which are the Auristatin derivatives
> incorporated into our most advanced clinical products.  Thus, although we will be
> paying ASU annual maintenance fees and progress-dependent milestones, we do not
> expect to owe ASU any royalties in the foreseeable future.

Again, ASU did not object.  A true and correct copy of SeaGen's August 21, 2008 email is

attached as Exhibit G.

78.     SeaGen obtained FDA approval for ADCETRIS in 2011.  During that time,

SeaGen spent nearly half a billion dollars on research, development, manufacturing and

clinical testing to achieve approval of ADCETRIS for the treatment of two rare, fatal forms

of lymphoma:  relapsed Hodgkin lymphoma and relapsed systemic anaplastic large cell

lymphoma.  The patients suffering from these diseases had little hope prior to ADCETRIS

since no new therapeutics had been approved for their treatment in over 30 years.

79.     As noted above, ASU has known for many years that SeaGen had

deemphasized its research with ASU's Auristatin E, and instead had focused on

synthesizing and developing new compounds of its own to test as candidates for cancer-

killing components in ADCs.  SeaGen answered all of ASU's questions raised during the

negotiation of Amendment No. 3, including questions presented by ASU's outside counsel

regarding the development of MMAE.  ASU then agreed that MMAE and ADCETRIS were

an SGI COMPOUND and an INDEPENDENT PRODUCT, respectively, and were not covered by ASU's patent rights. In addition, ASU agreed that SeaGen would not owe to ASU any milestone or royalty payments for any product using MMAE.

80.     ASU's claims are barred by the explicit terms of the License and Amendment No. 3.

## FOURTH AFFIRMATIVE DEFENSE

### (Laches)

81.     ASU's claims for alleged infringement are barred in whole or in part by the doctrine of laches.

82.     SeaGen incorporates by reference all preceding paragraphs as though fully set forth herein.

83.     Despite knowing of SeaGen's use of MMAE in its antibody-drug conjugate program for over 10 years, ASU made no claim that MMAE infringed, or was covered by the claims of, the '483 patent.  Although ASU now claims that SeaGen's use of MMAE, both by itself and in antibody drug conjugates such as ADCETRIS, constitutes patent infringement, ASU has been aware of SeaGen's use of MMAE, and of the chemical structure of MMAE, since at least July 2, 2003, and likely before then.

84.     On July 2, 2003 SeaGen sent ASU a reprint of SeaGen's 2003 MMAE publication.  (See Exhibit B.)  This publication describes the work SeaGen undertook to make Auristatin E-based ADCs and MMAE-based ADCs (including the ADC which is now sold as ADCETRIS) and compares the Auristatin E-based ADC and MMAE-based ADCs in *in vitro* and *in vivo* studies.  This publication gave ASU details of SeaGen's experiments and specifically informed ASU that the Auristatin E-based ADCs presented problems with respect to specificity and toxicity and that SeaGen was pursuing a more promising drug candidate, MMAE.

85.     In 2004, SeaGen again informed ASU of SeaGen's development of MMAE and other new auristatins through one of its progress reports under the License.  During the

ROSHKA DeWULF & PATTEN, PLC
ONE ARIZONA CENTER
400 EAST VAN BUREN – SUITE 800
PHOENIX, ARIZONA 85004
TELEPHONE NO. 602-256-6100
FACSIMILE 602-256-6800

discussions leading up to Amendment No. 3, SeaGen again advised ASU of the discoveries SeaGen had made during its own research and development work on new compounds, including MMAE, and SeaGen's belief that these new compounds were not covered by the '483 patent.   (See Exhibit C.)   These negotiations lasted for more than three months and included ASU and its attorneys, including outside patent counsel.

86.    After the parties agreed to Amendment No. 3, further progress reports from SeaGen explicitly informed ASU of SeaGen's extensive activities with MMAE and ADCs incorporating MMAE.  Through these reports, ASU was explicitly informed, by at least 2007, that ASU had filed an Investigative New Drug application for the ADC now marketed as ADCETRIS, and that this ADC was in ongoing clinical trials.   These reports also informed ASU of the work SeaGen was doing on other auristatins, including citations to various publications based on this work.

87.    During this time, SeaGen spent nearly half a billion dollars on research, development, manufacturing and clinical testing to achieve approval of ADCETRIS for the treatment of two rare, fatal forms of lymphoma:  relapsed Hodgkin lymphoma and relapsed systemic anaplastic large cell lymphoma.

88.    While SeaGen has developed many alternative cytotoxic drugs for use in ADCs, SeaGen made a business decision after entering into Amendment No. 3 to focus on MMAE and include MMAE as the cytotoxic agent in its lead ADC candidate, now sold as ADCETRIS.  SeaGen has been significantly prejudiced by ASU's unreasonable, ten year delay in filing suit or claiming infringement, despite ASU having full knowledge of SeaGen's extensive activities during this period.

89.    ASU's delay in filing suit is unreasonable and inexcusable.  This delay has caused injury and prejudice to SeaGen.

. . .

. . .

**ROSHKA DeWULF & PATTEN, PLC**
ONE ARIZONA CENTER
400 EAST VAN BUREN - SUITE 800
PHOENIX, ARIZONA 85004
TELEPHONE NO. 602-256-6100
FACSIMILE 602-256-6800

ROSHKA DEWULF & PATTEN, PLC
ONE ARIZONA CENTER
400 EAST VAN BUREN – SUITE 800
PHOENIX, ARIZONA 85004
TELEPHONE NO. 602-256-6100
FACSIMILE 602-256-6800

## FIFTH AFFIRMATIVE DEFENSE

### (Equitable Estoppel)

90.     ASU's claims for alleged infringement are barred by the doctrine of equitable estoppel.

91.     SeaGen incorporates by reference all preceding paragraphs as though fully set forth herein.

92.     ASU acknowledged and agreed in 2004 that SeaGen would not have any obligation to pay ASU any milestones or royalties with respect to products utilizing or incorporating SGI COMPOUNDS or any variants, analogues or derivatives thereof (collectively, "INDEPENDENT PRODUCTS"), including ADCs incorporating MMAE.  In consideration of the clarifying amendment and acknowledgement from ASU, SeaGen agreed to pay ASU a one-time fee and additional predetermined annual maintenance fees thereafter until the expiration of the '483 patent.

93.     After completing Amendment No. 3 SeaGen continued to work diligently to develop ADCETRIS, including several more years of research and development and then many years in clinical trials, spending close to half a billion dollars of its own funds.

94.     SeaGen confirmed its activities and its understanding of Amendment No. 3 with ASU several times.  On March 7, 2005 SeaGen emailed an excerpt of its upcoming March 15, 2005 Annual Report to ASU's licensing arm for review.  (See Exhibit E.)  The excerpt stated:

> *"Arizona State University.* In February 2000, we entered into a license agreement with Arizona State University for a worldwide, exclusive license to the cell-killing agent Auristatin E.  We subsequently amended this agreement in August 2004.  Under the terms of the amended agreement, we are required to pay annual maintenance fees to Arizona State University until expiration of their patents covering Auristatin E.  We are not, however, required to pay any progress-dependent milestone payments or royalties on net sales of products incorporating the Auristatin derivatives currently used in our ADC technology, and thus we do not expect to pay any milestones or royalties to Arizona State University with respect to products employing our current ADC technology."

ROSHKA DeWULF & PATTEN, PLC
ONE ARIZONA CENTER
400 EAST VAN BUREN ~ SUITE 800
PHOENIX, ARIZONA 85004
TELEPHONE NO. 602-256-6100
FACSIMILE 602-256-6800

ASU did not object.  This language was then filed verbatim in SeaGen's Annual Report and Form 10-K, a publicly available document.  (See Exhibit F.)  Similarly, SeaGen reminded ASU, through its licensing arm, AzTE, of SeaGen's current activities and the terms of Amendment No. 3 on August 21, 2008:

> Just to clarify, Seattle Genetics is not currently selling any products utilizing ASU's technology.  Also, our agreement with ASU was amended on August 17, 2004 to provide that Seattle Genetics will not owe any royalties to ASU for products utilizing MMAE, MMAF or any derivatives thereof, which are the Auristatin derivatives incorporated into our most advanced clinical products.  Thus, although we will be paying ASU annual maintenance fees and progress-dependent milestones, we do not expect to owe ASU any royalties in the foreseeable future.

Again, ASU did not object.  (See Exhibit G.)

95.     Throughout this time, SeaGen continued to make, and ASU continued to accept, the annual payments required under Amendment No. 3 and the License.  SeaGen has made, and ASU has accepted, all payments due.

96.     SeaGen has developed many alternative cytotoxic drugs for use in ADCs.  After entering into Amendment No. 3, SeaGen made a business decision to focus on MMAE and include MMAE as the cytotoxic agent in its lead ADC candidate, now sold as ADCETRIS.  As SeaGen's lead ADC candidate progressed towards FDA approval, SeaGen, on multiple occasions, communicated to ASU that, in accordance with Amendment No. 3, SeaGen would not be paying ASU royalties for products utilizing MMAE.  ASU did not dispute SeaGen's understanding of Amendment No. 3 nor did ASU communicate any intention to renege on its contractual obligations and sue SeaGen for patent infringement.  Instead, ASU lay in wait while SeaGen spent nearly half a billion dollars on research, development, manufacturing and clinical testing to achieve approval of an ADC using MMAE as the cytotoxic agent.

97.    ASU, by entering into Amendment No.3 and through its conduct afterwards, as well as ASU's silence in response to SeaGen's continued reiteration that no royalty would be paid to ASU for any INDEPENDENT PRODUCTS, and ASU's acquiescence to the activities reported by SeaGen, led SeaGen to reasonably infer that ASU did not intend to enforce the '483 patent against SeaGen for any activities related to MMAE or any ADC incorporating MMAE.  SeaGen relied on ASU's conduct, silence and acquiescence in choosing to proceed with MMAE as the cytotoxic agent in ADCETRIS, and SeaGen will be materially prejudiced if ASU is allowed to proceed with its claim of patent infringement.

## SIXTH AFFIRMATIVE DEFENSE

### Waiver

98.    ASU's claims for alleged infringement are barred by the doctrine of waiver.

99.     SeaGen incorporates by reference all preceding paragraphs as though fully set forth herein.

100.    On or about October 8, 2001, SeaGen submitted a progress report to ASU stating that Auristatin E "does not appear to have an appropriate therapeutic window on its own to consider it for development" and the hydrazone linked, Auristatin E-based ADCs SeaGen was developing did not yet have "stability that results in an appropriate therapeutic window for development and ultimately clinical trials."

101.    In June, 2002, SeaGen again informed ASU that the Auristatin E compounds licensed under the 2000 License did not appear suitable for conjugation to antibodies because the resulting ADCs were unstable.  SeaGen also informed ASU that SeaGen's scientists had independently developed new compounds that showed more promise.

102.    On July 2, 2003 SeaGen sent ASU a reprint of SeaGen's 2003 MMAE publication.  (See Exhibit B.)  This publication describes the work SeaGen undertook to make Auristatin E-based ADCs and MMAE-based ADCs and compares the Auristatin E-based ADC and MMAE-based ADCs in *in vitro* and *in vivo* studies.  This publication gave ASU details of SeaGen's experiments and specifically informed ASU that the Auristatin E-

ROSHKA DeWULF & PATTEN, PLC
ONE ARIZONA CENTER
400 EAST VAN BUREN - SUITE  800
PHOENIX, ARIZONA 85004
TELEPHONE NO. 602-256-6100
FACSIMILE 602-256-6800

based ADCs presented problems with respect to specificity and toxicity and that SeaGen was pursuing a more promising drug candidate, MMAE.  Further, SeaGen's 2003 MMAE publication also clearly showed the MMAE compound, its difference from Auristatin E, and how that difference makes MMAE-based ADCs clinically viable.  (See Exhibit B at 2, Figure 1.)  SeaGen's 2003 MMAE publication also clearly identifies the SeaGen scientists doing work with both Auristatin E and MMAE, including Dr. Peter Senter and Dr. Brian Toki.

103.    Thus, at least by July 2, 2003, SeaGen had fully (1) informed ASU that the Auristatin E-based ADCs presented significant barriers to clinical development, (2) informed ASU that SeaGen had independently developed MMAE, and told ASU of the structure of MMAE and its difference from the structure of Auristatin E, (3) informed ASU that SeaGen was working with MMAE to make MMAE-based ADCs that were showing great promise, and (4) informed ASU that the same SeaGen scientists who had initially worked with Auristatin E from ASU were working on MMAE and MMAE-based ADCs.

104.    In 2004, SeaGen again informed ASU of SeaGen's development of MMAE and other new auristatins through one of its progress reports under the License.  During the discussions leading up to Amendment No. 3, SeaGen again advised ASU of the discoveries SeaGen had made during its own research and development work on new compounds, including MMAE, and SeaGen's belief that these new compounds were not covered by the '483 patent.  (See Exhibit C.)  These negotiations lasted for more than three months and included ASU and its attorneys, including outside patent counsel.

105.    Instead of terminating the License, the parties agreed to amend it.  (See Exhibit D.)  At the time, since there was substantial uncertainty whether any ADCs incorporating ASU's Auristatin E would ever overcome the many clinical and regulatory hurdles necessary to become an approved drug, ASU elected to renegotiate the terms of the License to receive increased guaranteed annual compensation instead of termination of the license.  In Amendment No. 3, ASU and SeaGen agreed that the '483 patent did *not* cover

ROSHKA DeWULF & PATTEN, PLC
ONE ARIZONA CENTER
400 EAST VAN BUREN - SUITE 800
PHOENIX, ARIZONA 85004
TELEPHONE NO. 602-256-6100
FACSIMILE 602-256-6800

SeaGen's proprietary new compounds, including (i) MMAE, MMAF and AFP; and (ii) any prodrug forms of MMAE, MMAF and AFP (collectively, "SGI COMPOUNDS").  (See Exhibit D, ¶ 1).

106.    ASU acknowledged and agreed in 2004 that SeaGen would not have any obligation to pay ASU any milestones or royalties with respect to products utilizing or incorporating SGI COMPOUNDS or any variants, analogues or derivatives thereof, including ADCs incorporating MMAE.  In consideration of the clarifying amendment and acknowledgement from ASU, SeaGen agreed to pay ASU a one-time fee and additional predetermined annual maintenance fees thereafter until the expiration of the '483 patent.

107.    After the parties agreed to Amendment No. 3, further progress reports from SeaGen explicitly informed ASU of SeaGen's extensive activities with MMAE and ADCs incorporating MMAE including: its ongoing preclinical efficacy and toxicology experiments in 2005, the 2006 filing of an Investigative New Drug application for the ADC which is now sold as ADCETRIS, the phase I clinical trials in 2007 for the same, and so on.  These reports also informed ASU of the work SeaGen was doing on other auristatins, including citations to various publications based on this work.

108.    Throughout this time, SeaGen continued to make, and ASU continued to accept, the annual payments required under Amendment No. 3 and the License.  SeaGen has made, and ASU has accepted, all payments due.

109.    ASU's right to claim that MMAE and/or ADCETRIS infringe the '483 patent was deliberately waived by ASU's signing of the License and Amendment No. 3 and its acceptance of payments under Amendment No 3.

## SEVENTH AFFIRMATIVE DEFENSE

### Legal Estoppel

110.    ASU's claims for alleged infringement are barred by the doctrine of legal estoppel.

ROSHKA DEWULF & PATTEN, PLC
ONE ARIZONA CENTER
400 EAST VAN BUREN - SUITE  800
PHOENIX, ARIZONA 85004
TELEPHONE NO. 602-256-6100
FACSIMILE 602-256-6800

111.    SeaGen incorporates by reference all preceding paragraphs as though fully set forth herein.

112.    ASU acknowledged and agreed in 2004 that SeaGen would not have any obligation to pay ASU any milestones or royalties with respect to products utilizing or incorporating SGI COMPOUNDS, including ADCs incorporating MMAE.  In consideration of the clarifying amendment and acknowledgement from ASU, SeaGen agreed to pay ASU a one-time fee and additional predetermined annual maintenance fees thereafter until the expiration of the '483 patent.

113.    After the parties agreed to Amendment No. 3, SeaGen continued to make, and ASU continued to accept, the annual payments required under Amendment No. 3 and the License.  SeaGen has made, and ASU has accepted, all payments due.

114.    Having received valuable consideration in exchange for the rights granted under Amendment No. 3, ASU is now barred from derogating from those rights and alleging that MMAE and/or ADCETRIS infringe the '483 patent.

## EIGHTH AFFIRMATIVE DEFENSE

### Invalidity

115.    ASU is barred from obtaining any relief sought in the Complaint because the '483 patent, and each claim thereof, is invalid for failing to comply with the provisions of patent laws, Title 35 of the United States Code, including 35 U.S.C. §§ 101, 103, and/or 112.

116.    SeaGen incorporates by reference all preceding paragraphs as though fully set forth herein.

117.    SeaGen contends that the '483 patent claims asserted by ASU are invalid.  In particular, one or more claims of the '483 patent are invalid for failure to meet the requirements set forth in Title 35 of the United States Code, including without limitation one or more of 35 U.S.C. §§ 101, 103, and 112.  By way of example, in light of ASU's attempt to expand the scope of the '483 patent claims to cover MMAE and ADCETRIS, the

ROSHKA DEWULF & PATTEN, PLC
ONE ARIZONA CENTER
400 EAST VAN BUREN - SUITE 800
PHOENIX, ARIZONA 85004
TELEPHONE NO 602-256-6100
FACSIMILE 602-256-6800

claims of the '483 patent are invalid under 35 U.S.C. § 112(a) for lack of written description and enablement because they improperly encompass subject matter that is not disclosed or enabled in the specification.

## NINTH AFFIRMATIVE DEFENSE

### Inequitable Conduct

118.    The '483 patent is unenforceable because of inequitable conduct before the PTO by ASU and its counsel during prosecution of the application that led to the '483 patent.

119.    SeaGen incorporates by reference all preceding paragraphs as though fully set forth herein.

120.    During prosecution of the '483 patent, ASU and its counsel knew or should have known that all patent applicants and their counsel are under a duty to act with good faith and candor before the PTO and are required by 37 C.F.R. § 1.56 to disclose material information to the PTO.

121.    In connection with the application for the '483 patent, George Robert Pettit and Jozsef Barkoczy, the inventors of the '483 patent, signed a declaration in which they attested to their awareness of their duty of good faith and candor before the PTO and the requirement of 37 C.F.R. § 1.56 to disclose material information to the PTO.

122.    The attorneys and agents who prosecuted the '483 patent on behalf of ASU, including but not limited to Richard R. Mybeck, were registered patent attorneys who knew or should have known of their duty of good faith and candor before the PTO and the requirement of 37 C.F.R. § 1.56 to disclose material information to the PTO.

123.    An affirmative misrepresentation of a material fact and/or the submission of false material information with an intent to deceive the PTO constitutes inequitable conduct before the PTO and renders the patent unenforceable.

. . .

ROSHKA DEWULF & PATTEN, PLC
ONE ARIZONA CENTER
400 EAST VAN BUREN – SUITE 800
PHOENIX, ARIZONA 85004
TELEPHONE NO. 602-256-6100
FACSIMILE 602-256-6800

29

124.    On December 3, 1992, Mybeck and ASU filed application no. 07/985,827 (eventually issued as the '483 patent) with the PTO.  Included with the application was purported biological activity data for 11 compounds (6a-6k).  Compound 6j was represented



**6h** ($R^4$=CH3, $R^5$=H, $R^6$=CH3, $R^7$=H, $R^8$=OH)

**6i** ($R^4$=H, $R^5$=H, $R^6$=CH3, $R^7$=OH, $R^8$=H)

**6j** ($R^4$=H, $R^5$=CH3, $R^6$=H, $R^7$=OH, $R^8$=H)

**6k** ($R^4$=H, $R^5$=CH3, $R^6$=H, $R^7$=H, $R^8$=OH)

as having the structure shown wherein "R4 =H, R5 =CH3, R6=H, $R^7$=OH, $R^8$=H":

125.    At the time the application was filed, Pettit and Barkoczy were aware that Compound 6j had never been synthesized or tested for biological activity.   With specific intent to deceive the PTO, Mybeck, ASU, Pettit and/or Barkoczy provided false biological activity data for Compound 6j, including false P-388 data, to the patent office along with the argument that this data "clearly demonstrate[s] that compounds designated 6a-6k have antineoplastic, or tumor inhibiting utility."

126.    There is no question that this submission of false biological activity data materially impacted the scope of the claims of the '483 patent.  The Examiner's July 10, 1996, Statement of Reasons for Allowance stated only that:  "The instant invention is enabled because of the correlation of cell line P-388 to in vivo use[.]"  Had the PTO been

**ROSHKA DEWULF & PATTEN, PLC**
ONE ARIZONA CENTER
400 EAST VAN BUREN - SUITE 800
PHOENIX, ARIZONA 85004
TELEPHONE NO. 602-256-6100
FACSIMILE 602-256-6800

aware that P-388 data for Compound 6j did not exist and that Compound 6j had never been made, the claims of the '483 patent would not have issued as written.

## TENTH AFFIRMATIVE DEFENSE

### Failure to State a Claim

127.    ASU's Complaint fails to state a claim upon which relief may be granted.  As acknowledged in ASU's Complaint, MMAE is different from the chemical compounds claimed in the '483 patent.  Moreover, SeaGen has a license to all relevant compounds claimed in the '483 patent.  With regards to ADCETRIS, ASU has explicitly agreed in writing that SeaGen "will not pay ASU any milestones or royalties with respect to products utilizing or incorporating" MMAE.  Therefore, SeaGen cannot infringe the '483 patent on the grounds stated in ASU's Complaint, cannot be liable to ASU for damages and ASU has failed to state a claim upon which relief may be granted.

## COUNTERCLAIMS

SeaGen for its counterclaims against ASU and upon information or belief, states as follows:

### PARTIES

1.    Counterclaimant Seattle Genetics, Inc. ("SeaGen") is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 21823 – 30th Drive S.E., Bothell, WA 98021.

2.    Counterdefendant The Arizona Board of Regents purports to be a body corporate established under the Arizona Constitution and, pursuant to A.R.S. § 15-1625 to have authority to act for and on behalf of Arizona State University.

### JURISDICTION AND VENUE

3.    This Counterclaim arises under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq.*, the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the laws of Arizona.

ROSHKA DEWULF & PATTEN, PLC
ONE ARIZONA CENTER
400 EAST VAN BUREN - SUITE 800
PHOENIX, ARIZONA 85004
TELEPHONE NO 602-256-6100
FACSIMILE 602-256-6800

4. By filing its Complaint, The Arizona Board of Regents for and on behalf of Arizona State University (collectively "ASU") has consented to the personal jurisdiction of this Court and waived its sovereign immunity. Further, ASU is subject to personal jurisdiction in this district arising out of its systematic and continuous contacts with this district and its purposeful acts and/or transactions directed toward this district.

5. This court has original jurisdiction over the subject matter of these counterclaims pursuant to 28 U.S.C. §§ 1331 and 1338 to the extent they arise under the Patent Laws of the United States.

6. This court has supplemental jurisdiction over any non-federal claims pursuant to 28 U.S.C. § 1367 because any non-federal claims are so related to claims in the action within the Court's original jurisdiction that they form part of the same case or controversy.

7. ASU has accepted venue with regard to the present suit.

## FACTUAL BACKGROUND

8. On February 3, 2000, SeaGen entered into License Agreement No. 651-01.LIC ("the License") with the Arizona Board of Regents acting on behalf of ASU. A true and correct, redacted copy of the 2000 License is attached as Exhibit A and incorporated herein by reference. The License specifically grants to SeaGen the exclusive right to the following:

"ASU's PATENT RIGHTS" shall mean patent rights to certain subject matter, which is included in the following:

Under ASU Case No. 651:
U.S. Patent No. 5,635,483 entitled "Tumor Inhibiting Tetrapeptide Bearing Modified Phenethyl Amides".

For the purposes of this Agreement, only those compounds taught in the above named patent and identified as stereoisomers of a compound commonly referred to as "Auristatin E" are included in this license and the grant of rights described in Article 2 of this Agreement shall pertain only to the following:

ROSHKA DeWULF & PATTEN, PLC
ONE ARIZONA CENTER
400 EAST VAN BUREN ~ SUITE 800
PHOENIX, ARIZONA 85004
TELEPHONE NO 602-256-6100
FACSIMILE NO 602-256-6800

ROSHKA DEWULF & PATTEN, PLC
ONE ARIZONA CENTER
400 EAST VAN BUREN - SUITE 800
PHOENIX, ARIZONA 85004
TELEPHONE NO 602-256-6100
FACSIMILE 602-256-6800

Auristatin E, Compound No. 1S2R
Auristatin E, Compound No. 1R2R
Auristatin E, Compound No. 1S2S
Auristatin E, Compound No. 1R2S

Each of which falls within the general structure shown below:



and any corresponding extensions or foreign applications or patents.

9.      Auristatin E is a synthetic variant of Dolastatin 10, a compound that exists in nature and which is effective in killing cells in the laboratory but is too toxic for use as a therapeutic agent in patients.

10.     ASU and others have worked on Dolastatin 10 and related compounds, including auristatins, for over forty years but have been unsuccessful in developing any of them as a therapeutic product.

11.     At the time it entered the License, SeaGen was searching for a cytotoxic compound to link, or conjugate, to a monoclonal antibody to create an antibody-drug conjugate ("ADC").  SeaGen conducted extensive testing to determine whether Auristatin E demonstrated promise for incorporation into an ADC.  Unfortunately, SeaGen found that when Auristatin E was conjugated to an antibody the resulting ADC was unstable, was unlikely to be effectively delivered to a cancer cells within the human body and so was not suitable for use in clinical testing.  SeaGen disclosed these difficulties to ASU in order to keep ASU informed of SeaGen's development efforts and SeaGen also published its work at scientific meetings.

12.   The failure of ASU's Auristatin E to work as an antibody-drug conjugate forced SeaGen to look for a different solution.  Because Dr. Peter Senter's team had independently developed methods of making the components of Auristatin E it was also able to create and test new and different compounds that differed from Dolastatin 10 and Auristatin E.  One of those new compounds was Monomethyl Auristatin E ("MMAE").

13.   SeaGen filed its first patent application on MMAE on April 30, 2001.  It was published in November, 2002.  A continuation-in-part of this application has matured into U.S. Patent 6,884,869.  A second, related, patent application was published in February, 2004.  Three other U.S. patents in the same family have now issued.  These patents and published applications publicly disclosed SeaGen's new methods of making MMAE and its components.

14.   On or about October 8, 2001, SeaGen submitted a progress report to ASU stating that Auristatin E "does not appear to have an appropriate therapeutic window on its own to consider it for development" and the Auristatin E-based ADCs SeaGen was developing did not yet have "stability that results in an appropriate therapeutic window for development and ultimately clinical trials."

15.   In June, 2002, SeaGen again informed ASU that the Auristatin E compounds licensed under the 2000 License did not appear suitable for conjugation to antibodies because the resulting ADCs were unstable.  SeaGen also informed ASU that SeaGen's scientists had independently developed new compounds that showed more promise.

16.   In 2003 SeaGen sent ASU a reprint of SeaGen's first publication on the technology SeaGen developed, published in Nature Biotechnology, "Development of potent monoclonal antibody auristatin conjugates for cancer therapy," Doronina, *et al. Nature Biotech.* (2003) 21 (7): 778-784 ("SeaGen's 2003 MMAE publication").  A true and correct copy of SeaGen's 2003 MMAE publication is attached as Exhibit B.  This publication describes the work SeaGen undertook to make Auristatin E-based ADCs and MMAE-based ADCs and compares the Auristatin E-based ADC and MMAE-based ADCs in *in vitro* and

*in vivo* studies.  This publication gave ASU details of SeaGen's experiments and specifically informed ASU that the Auristatin E-based ADCs presented problems with respect to specificity and toxicity and that SeaGen was pursuing a more promising cytoxic agent, MMAE.  Further, SeaGen's 2003 MMAE publication also clearly showed the MMAE compound, its difference from Auristatin E, and how that difference makes MMAE-based ADCs clinically viable.  (See Exhibit B, at 2, Figure 1.)

17.    In 2004, SeaGen again informed ASU of SeaGen's development of MMAE and other new auristatins through one of its progress reports under the License.  SeaGen also advised ASU of the discoveries SeaGen had made during its own research and development work on new compounds, including MMAE, and SeaGen's belief that these new compounds were not covered by the '483 patent.   Attached as Exhibit C are true and correct, redacted copies of correspondence between SeaGen and ASU's licensing arm, AzTE, in 2004 during discussions that led to Amendment No. 3 to the License.  These negotiations lasted for more than three months and included ASU and its attorneys, including outside patent counsel.

18.    As a result of these discussion and instead of terminating the License, the parties agreed to amend it.  A true and correct, redacted copy of the amendment ("Amendment No. 3") is attached as Exhibit D and incorporated herein by reference.  At the time, since there was substantial uncertainty whether any ADCs incorporating ASU's Auristatin E would ever overcome the many clinical and regulatory hurdles necessary to become an approved drug, ASU elected to renegotiate the terms of the  License to receive increased guaranteed annual compensation instead of termination of the license.

19.    Amendment No. 3 states, among other things, that:

**ASU acknowledges and agrees that ASU's PATENT RIGHTS do not cover (a) MMAE**, MMAF and AFP (each as defined in Exhibit A [which provides pictures of each of the three compounds]); and (b) any prodrug forms of MMAE, MMAF and AFP (collectively, "SGI COMPOUNDS").  ASU acknowledges and agrees that the LICENSEE **will not pay ASU any milestones or royalties with respect to products utilizing or incorporating SGI COMPOUNDS** or any variants, analogues

ROSHKA DeWULF & PATTEN, PLC
ONE ARIZONA CENTER
400 EAST VAN BUREN - SUITE  800
PHOENIX, ARIZONA 85004
TELEPHONE NO. 602-256-6100
FACSIMILE 602-256-6800

or derivatives thereof (collectively, "INDEPENDENT PRODUCTS"). (Emphasis added).

20.    After the parties agreed to Amendment No. 3, further progress reports from SeaGen explicitly informed ASU of SeaGen's extensive activities with MMAE and ADCs incorporating MMAE including: its ongoing preclinical efficacy and toxicology experiments in 2005, the 2006 filing of an Investigative New Drug application for the ADC which is now sold as ADCETRIS, the phase I clinical trials in 2007 for the same, and so on.  These reports also informed ASU of the work SeaGen was doing on other auristatins, including citations to various publications based on this work.

21.    ASU acknowledged and agreed in 2004 that SeaGen would not have any obligation to pay ASU any milestones or royalties with respect to products utilizing or incorporating SGI COMPOUNDS or any variants, analogues or derivatives thereof, including ADCs incorporating MMAE.  In consideration of the clarifying amendment and acknowledgement from ASU, SeaGen agreed to pay ASU a one-time fee and additional predetermined annual maintenance fees thereafter until the expiration of the '483 patent.

22.    SeaGen obtained FDA approval for ADCETRIS in 2011.  During that time, SeaGen spent nearly half a billion dollars on research, development, manufacturing and clinical testing to achieve approval of ADCETRIS for the treatment of two rare, fatal forms of lymphoma:  relapsed Hodgkin lymphoma and relapsed systemic anaplastic large cell lymphoma.  The patients suffering from these diseases had little hope prior to ADCETRIS since no new therapeutics had been approved for their treatment in over 30 years.

23.    As noted above, ASU has known for many years that SeaGen had deemphasized its research with ASU's Auristatin E, and instead had focused on synthesizing and developing new compounds of its own to test as candidates for cancer-killing components in ADCs.  SeaGen answered all of ASU's questions raised during the negotiation of Amendment No. 3, including questions presented by ASU's outside counsel regarding the development of MMAE.  ASU then agreed that SeaGen would not have any

ROSHKA DeWULF & PATTEN, PLC
ONE ARIZONA CENTER
400 EAST VAN BUREN – SUITE 800
PHOENIX, ARIZONA 85004
TELEPHONE NO 602-256-6100
FACSIMILE 602-256-6800

36

obligation to pay ASU any milestones or royalties with respect to products utilizing or incorporating SGI COMPOUNDS or any variants, analogues or derivatives thereof, including ADCs incorporating MMAE such as ADCETRIS. In consideration of the clarifying amendment and acknowledgement from ASU, SeaGen agreed to pay ASU a one-time fee and additional predetermined annual maintenance fees thereafter until the expiration of the '483 patent.

## FIRST COUNTERCLAIM

### Declaratory Judgment of Noninfringement of '483 patent

24.      SeaGen incorporates by reference paragraphs 1-24 of its counterclaims as though fully set forth herein.

25.      ASU purports to own United States Patent No. 5,635,483 and has alleged that SeaGen infringes or has infringed one or more claims of the '483 patent.

26.      SeaGen has not infringed any valid and enforceable claim of the '483 patent, either literally or under the doctrine of equivalents, nor has SeaGen actively induced or contributed to any infringement of the '483 patent.

27.      Neither MMAE nor ADCETRIS is claimed by the '483 patent.

28.      Auristatin E is never made or released during the lifecycle of ADCETRIS, and Auristatin E is not a metabolite of MMAE in the human body.  The differences between MMAE and Auristatin E are substantial, and these compounds are not recognized as being interchangeable.  Further, the differences between ADCETRIS and Auristatin E are substantial, and these compounds are not recognized as being interchangeable.

29.      Neither ADCETRIS nor MMAE is used in a method of inhibiting the growth of cancer cells selected from the group of cell lines consisting of P388, OVCAR-3, SF295, A498, NCI-460, or KM20L2, as claimed in Claim 4 of the '483 patent.

30.      As a result of ASU's filing of this suit, an actual, substantial controversy regarding the non-infringement of the '483 patent exists between SeaGen and ASU and is of sufficient immediacy and reality to warrant issuance of declaratory judgment.

37

31.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq*. and 35 U.S.C. §§ 1 *et seq*., SeaGen is entitled to a declaration by the Court that it does not infringe and has not infringed any claims of the '472 patent.

32.     SeaGen is entitled to further necessary or proper relief based on the Court's declaratory judgment or decree.

## SECOND COUNTERCLAIM

### Declaratory Judgment of Invalidity of '483 patent

33.     SeaGen incorporates by reference paragraphs 1-24 of its counterclaims as though fully set forth herein.

34.     ASU has alleged that SeaGen infringes or has infringed one or more claims of the '472 patent.  In so doing, ASU has asserted that the '483 patent is valid.

35.     SeaGen contends that the '483 patent claims are invalid.  In particular, one or more claims of the '483 patent are invalid for failure to meet the requirements set forth in Title 35 of the United States Code, including without limitation one or more of 35 U.S.C. §§ 101, 103, and 112.

36.     By way of example, in light of ASU's attempt to expand the scope of the '483 patent claims to cover MMAE and ADCETRIS, the claims of the '483 patent are invalid under 35 U.S.C. §§ 112(a) for lack of written description and enablement because they improperly encompass subject matter that is not disclosed in the specification.

37.     Thus, an actual substantial controversy regarding the invalidity of the '483 patent exists between SeaGen and ASU and is of sufficient immediacy and reality to warrant issuance of a declaratory judgment.

38.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq*. and 35 U.S.C. §§ 1 *et seq*., SeaGen is entitled to a declaration by the Court that the '483 patent is invalid.

39.     SeaGen is entitled to further necessary and proper relief based on the Court's declaratory judgment or decree.

ROSHKA DeWULF & PATTEN, PLC
ONE ARIZONA CENTER
400 EAST VAN BUREN - SUITE 800
PHOENIX, ARIZONA 85004
TELEPHONE NO. 602-256-6100
FACSIMILE 602-256-6800

ROSHKA DeWULF & PATTEN, PLC
ONE ARIZONA CENTER
400 EAST VAN BUREN - SUITE 800
PHOENIX, ARIZONA 85004
TELEPHONE NO. 602-256-6100
FACSIMILE 602-256-6800

### THIRD COUNTERCLAIM

### Breach of Implied Covenant of Good Faith and Fair Dealing

40.     SeaGen incorporates by reference paragraphs 1-24 of its counterclaims as though fully set forth herein.

41.     Under Arizona law, all contracts include implied covenants of good faith and fair dealing.

42.     The License, as amended, includes such an implied covenant.  Therefore, at all times after entering into the License ASU owed Seattle Genetics a duty to engage in good faith and fair dealing with respect to all future business related to the License and its amendments.

43.     ASU breached the covenant of good faith and fair dealing by agreeing, in 2004, after full disclosure by SeaGen of SeaGen's development activities regarding MMAE, that MMAE is not covered by the licensed rights under the '483 patent, accepting payments from SeaGen under Amendment No. 3, and now reneging on those agreements by claiming SeaGen has infringed the '483 patent, either directly or indirectly, through its use of MMAE.

44.     SeaGen provided valuable consideration to receive the benefit of Amendment No. 3, and ASU's bad faith filing of this lawsuit has diminished that benefit.

### FOURTH COUNTERCLAIM

### Declaratory Judgment of Exceptional Case

45.     SeaGen incorporates by reference paragraphs 1-24 of its counterclaims as though fully set forth herein.

46.     ASU acknowledged and agreed in Amendment No. 3 that SeaGen will not pay ASU any milestones or royalties with respect to products utilizing or incorporating SGI COMPOUNDS or any variants, analogues or derivatives thereof (collectively, "INDEPENDENT PRODUCTS"), including ADCs incorporating MMAE such as ADCETRIS.

47.     MMAE is different from the chemical compounds claimed in the '483 patent. Moreover, SeaGen has a license to all relevant compounds claimed in the '483 patent. Therefore, SeaGen cannot infringe the '483 patent.

48.     Since executing Amendment No. 3 in 2004, ASU has known that it cannot assert infringement of the '483 patent against SeaGen on the basis of MMAE or any SeaGen ADC incorporating MMAE.

49.      Nevertheless, ten years later, ASU filed this meritless lawsuit.

50.     SeaGen is entitled to declaratory relief that this baseless suit qualifies as an extraordinary case under 35 U.S.C. § 285 and to an award of all attorney's fees and costs incurred in defending against these baseless claims.

### PRAYER FOR RELIEF

WHEREFORE, Seattle Genetics, Inc. prays for judgment as follows:

a.     Holding that ASU take nothing by way of its Complaint;

b.     Holding that Seattle Genetics, Inc.'s products do not infringe, either literally or under the doctrine of equivalents, either directly or indirectly, any valid and enforceable claim of U.S. Patent No. 5,635,483;

c.     Holding the asserted claims of U.S. Patent No. 5,635,483 invalid;

d.     Holding the claims of U.S. Patent No. 5,635,483 unenforceable;

e.     Holding that ASU breached the implied covenant of good faith and fair dealing;

f.     Awarding Seattle Genetics, Inc. damages in amounts to be proven at trial;

g.     Finding that this case be decreed an "exceptional case" within the meaning of 35 U.S.C. § 285 and reasonable attorneys' fees and costs be awarded to Seattle Genetics, Inc.; and

h.     That Seattle Genetics, Inc. be awarded such other further relief as the Court deems just and proper.

ROSHKA DeWULF & PATTEN, PLC
ONE ARIZONA CENTER
400 EAST VAN BUREN - SUITE 800
PHOENIX, ARIZONA 85004
TELEPHONE NO 602-256-6100
FACSIMILE 602-256-6800

DATED this 21st day of April, 2014.

                               ROSHKA DeWULF & PATTEN, PLC

                               By____/s/_____Jennifer A. Stevens_____
                                  John E. DeWulf
                                  Jennifer A. Stevens
                                  One Arizona Center
                                  400 East Van Buren Street, Suite 800
                                  Phoenix, Arizona  85004

                               Attorneys for Defendant Seattle Genetics, Inc.

1

## CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2014, I electronically transmitted this document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF Registrants, and to the extent any party is not a CM/ECF Registrant at the time of filing, a copy is mailed this date by U.S. Mail.


/s/ Verna Colwell

**ROSHKA DEWULF & PATTEN, PLC**
ONE ARIZONA CENTER
400 EAST VAN BUREN – SUITE 800
PHOENIX, ARIZONA 85004
TELEPHONE NO. 602-256-6100
FACSIMILE 602-256-6800