**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Board of Regents, for and on behalf of Arizona State University,<br><br>Plaintiff,<br><br>v.<br><br>Seattle Genetics, Inc.,<br><br>Defendant. | No. CV-14-00653-PHX-NVW<br><br>**ORDER** |

Before the Court are Defendant Seattle Genetics, Inc.'s Motion for Summary Judgment (Docs. 256 (redacted), 310 (sealed)) and ASU's Motion for Partial Summary Judgment (Docs. 293 (redacted), 299 (sealed)). Each motion is supported by a separate statement of facts filed under seal and filed in a redacted version. Each party has filed an opposition to the opposing party's motion in sealed and redacted versions, a controverting statement of facts in sealed and redacted versions, and a reply in sealed and redacted versions. Oral argument on these motions was heard on June 30, 2015.

On motions for summary judgment, the movant must file a separate statement of facts, and any party opposing the motion must file a separate controverting statement of facts, which may include additional facts that establish a genuine issue of material fact or otherwise preclude judgment in favor of the moving party. LRCiv 56.1(a), (b). The movant is not permitted to file a separate statement responding to the non-movant's controverting statement of facts or the additional facts, but may include any evidentiary objections in the reply memorandum. LRCiv 7.2(m)(2). SeaGen's Response to ASU's

Supplemental Statement of Facts (Docs. 398 (redacted) and 416 (sealed)) is therefore not authorized by the Local Rules and will be stricken.

**I.  SUMMARY**

Plaintiff alleges that Defendant infringed Plaintiff's patent by making and selling a product using an anticancer drug similar to anticancer drugs covered by Plaintiff's patent. Defendant alleges that the anticancer drug in its product is not covered by Plaintiff's patent, but even if it were, Defendant is not liable for infringement because Plaintiff agreed in writing that Defendant will not pay Plaintiff any royalties for using Defendant's anticancer drug.

Undisputed evidence shows that when Plaintiff executed the agreement it knew Defendant believed its anticancer drug did not infringe Plaintiff's patent and Defendant intended to develop products using its anticancer drug instead of Plaintiff's anticancer drugs that Defendant was licensed to use. Further, it shows Defendant paid Plaintiff a substantial amount of money in exchange for Plaintiff's agreement that Defendant would not pay Plaintiff any royalties related to Defendant's anticancer drug, and Plaintiff understood that it would not receive any royalties related to Defendant's anticancer drug. Thus, Defendant is not required to compensate Plaintiff for making and selling products using Defendant's anticancer drug and cannot be held liable for patent infringement damages.

**II.  LEGAL STANDARD**

Summary judgment is proper if the evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden of identifying the basis for its motion and those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party has carried its burden, the nonmoving party must produce evidence to support its claim or defense by more than

simply showing "there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

On summary judgment, the nonmoving party's evidence is presumed true, and all inferences from the evidence are drawn in the light most favorable to the nonmoving party. *Eisenberg v. Ins. Co. of North America*, 815 F.2d 1285, 1289 (9th Cir. 1987); *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1117 (9th Cir. 2001). But conclusory and speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and to defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. 56(e)(2).

## III. UNDISPUTED MATERIAL FACTS

On June 3, 1997, the United States Patent and Trademark Office granted U.S. Patent No. 5,635,483 ("Patent") to Profs. George R. Pettit and Joszef Barkoczy. Arizona State University ("ASU") is the assignee of the Patent. The Patent expired in 2014.

On February 3, 2000, Seattle Genetics, Inc. ("SeaGen") entered into License Agreement No. 651-01.LIC ("License") with the Arizona Board of Regents acting on behalf of ASU. The License provided that it embodied the entire understanding of the parties and no amendment or modification would be binding on the parties unless made in writing and signed by each party.

### A. Original Terms of the License

The License included the following definitions:

1.2. "ASU's PATENT RIGHTS" shall mean patent rights to certain subject matter, which is included in the following:

Under ASU Case No. 651:
U.S. Patent No. 5,635,483 entitled "Tumor Inhibiting Tetrapeptide Bearing Modified Phenethyl Amides."

> For the purposes of this Agreement, only those compounds taught in the above named patent and identified as stereoisomers of a compound commonly referred to as "Auristatin E" are included in this license and the grant of rights described in Article 2 of this Agreement shall pertain only to the following:
>
> > Auristatin E. Compound No. 1S2R
> > Auristatin E. Compound No. 1R2R
> > Auristatin E. Compound No. 1S2S
> > Auristatin E. Compound No. 1R2S
>
> <u>Each of which falls within the general structure shown below:</u>
>
> > [diagram]
>
> and any corresponding extensions or foreign applications or patents.

> 1.7. "LICENSED PRODUCT" shall mean any material, composition, composition of matter, compound, device or embodiment the manufacture, use or sale of which would constitute, but for the license granted to the LICENSEE pursuant to this Agreement, an infringement of any VALID CLAIM contained in ASU's PATENT RIGHTS, as defined herein. For the purposes of this Agreement, LICENSED PRODUCT shall include combinations of chemical compounds in which a single agent such as Auristatin E is combined with another compound such as an antibody.

The License granted certain rights to SeaGen:

> 2.1 ASU hereby grants to LICENSEE an exclusive license in the TERRITORY and in the LICENSED FIELD OF USE, which shall include the right to grant sub-licenses, under ASU's PATENT RIGHTS, as specified in Paragraph 1.1, to develop, have developed, make, have made, market, import, sell, and otherwise use LICENSED PRODUCTS and to practice the LICENSED METHODS under ASU's PATENT RIGHTS.

Article 5 of the License, titled "PAYMENTS AND ROYALTIES," identified four types of payments SeaGen was required to make to ASU: (1) a license issue fee, (2) annual maintenance fees, (3) milestone payments, and (4) royalties. First, within ten days

of its effective date, the License required SeaGen to pay ASU "a non-refundable Issue Fee of $20,000." Second, the License required SeaGen to pay ASU "an annual maintenance fee" "each year until a 'New Drug [Application]' (NDA) is received by the US Food and Drug Administration," beginning at $30,000 and increasing by $5,000 each year to a maximum of $50,000. SeaGen was not required to pay an annual maintenance fee after the U.S. Food and Drug Administration ("FDA") received a New Drug Application.

Third, the License required SeaGen to make payments to ASU upon achievement of four specific clinical development milestones. For example, it required SeaGen to pay ASU $250,000 "upon FDA approval of an NDA for a LICENSED PRODUCT that constitutes a combination of a single agent such as Auristatin E and another compound such as an antibody."

Fourth, the License required SeaGen to "pay to ASU an EARNED ROYALTY of 5.5% of the NET SALES of all LICENSED PRODUCTS" that met certain criteria and "an EARNED ROYALTY of 2.0% the NET SALES of all LICENSED PRODUCTS" that met different criteria. The License also stated, "The LICENSEE shall pay to ASU an earned royalty ('EARNED ROYALTY') in accordance with the rules specified in Paragraphs 5.4 through 5.14."

Paragraph 5.4 required SeaGen to "pay to ASU a minimum annual royalty of $50,000 for the life of VALID CLAIMS of ASU's PATENT RIGHTS (the 'Minimum Annual Royalty'), beginning in the year of LICENSEE's first receipt of marketing approval for a LICENSED PRODUCT" from the FDA. It also required SeaGen to "account to ASU and pay royalties to ASU semi-annually within forty-five (45) days after the end of each calendar half-year for the just preceding calendar half-year." It required SeaGen to make an additional payment concurrent with its final payment for a calendar year "if necessary to meet its obligation to make minimum royalty payments for that year." Paragraph 5.7 stated:

> "Article 1 defines ASU's PATENT RIGHTS and LICENSED PRODUCTS so that royalties are payable on LICENSED PRODUCTS covered by a Valid Claim. EARNED ROYALTIES shall be due on LICENSED PRODUCTS in each country where relevant ASU's PATENT RIGHTS exist, for the duration of VALID CLAIMS of such ASU's PATENT RIGHTS in such country. EARNED ROYALTIES shall accrue to ASU when LICENSED PRODUCTS are invoiced, or if not invoiced, when delivered to a third party and shall be paid as set forth below."

Paragraph 5.8 required SeaGen to "pay EARNED ROYALTIES accruing to ASU on a semi-annual basis on or before" February 15 and August 15 of each year.

Article 16 of the License provided for termination by either party for default, liquidation, or bankruptcy of the other party. Further, Paragraph 16.3 permitted SeaGen to terminate the License without penalty:

> LICENSEE may terminate this Agreement with respect to such LICENSED PRODUCT or ASU PATENT RIGHT upon 30 days prior written notice with no further obligation to ASU except for the payment of any fees which came due or royalties accrued up until the date of termination.

### B.  Amendments to the License in 2000 and 2002

Approximately two weeks after the License was executed in February 2000, the parties amended the License. Although the amendment purported to amend Paragraph 18.1.4, which does not exist, it may have been intended to amend Paragraph 5.1.4 regarding the dates on which the two installments of the annual maintenance fee were due. The original language required payment of the first installment "on the six-month anniversary of the EFFECTIVE DATE," and the amendment required payment of the first installment "on the date that is six months after the anniversary of the EFFECTIVE DATE." The original language required payment of the second installment "on the one-year anniversary of the EFFECTIVE DATE," and the amendment required payment of the second installment "on the date that is one year after the anniversary of the EFFECTIVE DATE." But neither the original License nor the February 2000 amendment identified what was meant by "the date."

In March 2002, the parties executed a second amendment to the License, which stated that SeaGen would pay ASU $50,000 in consideration for entering into the amendment. The 2002 amendment postponed deadlines in Paragraphs 8.6.6, 8.6.7, and 8.6.8 for three of SeaGen's development obligations under the License and reduced the royalty rate for certain licensed products sold by SeaGen's sub-licensees. Paragraph 5.3.2 previously required SeaGen to pay ASU "an EARNED ROYALTY of 2.0% of the NET SALES of all LICENSED PRODUCTS." The 2002 amendment required SeaGen to pay ASU "an EARNED ROYALTY of 2.0% of the NET SALES of all LICENSED PRODUCTS by LICENSEE" for products constituting Auristatin E linked to a molecule owned or controlled by SeaGen and an "EARNED ROYALTY" of 1.0% of "NET SALES OF LICENSED PRODUCTS by SUBLICENSEES" of products constituting Auristatin E linked to a molecule not owned or controlled by SeaGen.

### C.   The Parties' Communications in 2004 Regarding "Amendment No. 3 to License Agreement"

In July 2003, SeaGen sent to ASU a reprint of its first publication about its MMAE technology. In April 2004, Eric Dobmeier, SeaGen's Vice President and General Counsel, contacted Brian Martin, representing ASU, regarding a third amendment to the License.

On April 12, 2004, Dobmeier emailed to Martin a document, which he described as "summarizing our views on the licensing/patent position for the new cytotoxic compounds we have invented, as well as a proposal for restructuring the license agreement between SGEN and ASU." The document stated that SeaGen independently invented new chemical compounds such as MMAE, AFP, and MMAF, and it provided analysis supporting SeaGen's conclusion that these compounds "fall outside" the claims of the Patent. The document also concluded, "Seattle Genetics does not believe that any fees, milestones or royalties are owed to ASU with respect to MMAE, AFP or MMAF or other chemical compounds not covered by the Patent." The document proposed that the parties enter into an amendment of the License instead of simply terminating it. SeaGen

proposed the following terms for the amendment: (1) SeaGen would pay ASU an annuity of $40,000 per year until the Patent either expired or was found invalid; (2) SeaGen would not pay ASU any milestones or royalties for MMAE, AFP, MMAF, or any other chemical compounds not covered by the Patent; and (3) if SeaGen used or developed any compounds covered by the Patent, SeaGen would pay ASU the milestones and royalties currently set forth in the License.

In May 2004, Martin and Peter Slate, representing ASU, spoke with several people at SeaGen. Subsequently, on May 13, 2004, Martin emailed Dobmeier, Slate, and others to schedule a meeting. Martin stated, "Seattle Genetics is proposing a restructuring of the license agreement to reflect the fact that the company is not actively pursuing development of the licensed compounds, but is actively pursuing the development of derivations/improvement of the licensed compounds." Martin further stated, "The next logical step is [to] have ASU scientists and IP coun[sel] speak with SG's scientists and IP coun[sel] to discuss the rational[e] for why the improved compounds are different from a composition of matter standpoint."

On June 4, 2004, scientists and counsel from both parties held a telephone conference call. They discussed SeaGen's development of MMAE and MMAF and its reasons for no longer developing products included in the License.

On June 23, 2004, Dobmeier emailed to Martin, Slate, and others a document, which he described as "a brief history of Seattle Genetics' development of MMAE, MMAF and other novel auristatin compounds." Dobmeier asserted that "there were no interactions or information flow between [SeaGen]'s chemistry group and ASU regarding these compounds."

On July 8, 2004, Martin emailed to Dobmeier a proposal for the third amendment of the License. It stated that the purposes of the amendment are to "resolve current ambiguities" regarding the Patent's "claim coverage," recognize the value of the relationship between SeaGen and ASU, and recognize the contribution made by ASU's Cancer Research Institute and Dr. G. R. Pettit to SeaGen. It further stated:

> SGEN's position is that the compounds MMAE, AFP, and MMAF are not covered by the license agreement. The company does not desire to drop the license but wants to ensure that ASU does not seek milestones or royalties based on the development of the aforementioned compounds.
>
> AzTE appreciates SGEN's approach to this matter. However, from AzTE's perspective, there is some remaining ambiguity regarding the claims coverage, wording in the license agreement, and SGEN's assertion that no royalties are due on the aforementioned technologies. AzTE does not acknowledge that the aforementioned compounds are not covered by ASU's patents, but would be willing to add an amendment stating that these compounds are not subject to milestones or royalties, if and only if SGEN continues to pay the $50,000 per year in annual maintenance fees as required by the existing license and pays an additional $50,000 for the amendment terms that clarify the exclusion of the three aforementioned compounds. This fee provides ASU with remuneration to compensate for the following: the opportunity cost of not licensing the patent claims to another entity, the ongoing costs related to patent maintenance which is not currently reimbursed by Seattle Genetics, and the contribution made by [ASU's Cancer Research Institute] and Dr. G. R. Pettit.

ASU's July 8, 2004 draft proposed that SeaGen continue to pay $50,000 in annual maintenance fees and also pay an additional $50,000 in annual fees to maintain the license even though SeaGen did "not foresee significant development of the licensed compounds." The draft also stated, "ASU's PATENT RIGHTS and LICENSED PRODUCTS do not include the chemical compounds MMAE, AFP, and MMAF and as such, the development of these compounds is not subject to milestones or royalties as dictated by the existing license agreement."

On July 28, 2004, Martin sent Dobmeier another draft of the proposed amendment, which differed from the July 8 draft in that it provided that the annual fee would begin at $20,000 and increase $5,000 per year until it reached $50,000 rather than setting the annual fee at $50,000 from the beginning. It also required SeaGen to reimburse ASU for "any and all ongoing patent costs related to ASU case 651." In his email, Martin told Dobmeier, "I think this is a fairly cheap insurance policy for SGEN, knowing that the company has the rights tied up for this compound and the other related compounds that your [*sic*] are advancing in clinical stages."

On July 29, 2004, Dobmeier proposed to Martin eliminating the provision that SeaGen pay patent costs and instead increase the annual payments to yield the $200,000 in additional value that ASU sought as consideration for the proposed amendment. Dobmeier stated, "Since we believe we're not covered by ASU's patent and we only licensed a few claims from a patent that I'm guessing has more than 25 claims, it doesn't seem fair for us to reimburse all patent costs." In response, Martin offered to drop the patent costs in exchange for a one-time payment of $30,000 in addition to the annual fee of $50,000 and subsequent annual fees beginning at $60,000 and increasing by $5,000 each year to a maximum of $100,000. Martin referred to this payment schedule as "a reasonable value given the assurances you're looking for and the opportunity cost for us."

On August 3, 2004, following up on a conversation the previous day, Dobmeier emailed Martin some examples of MMAE/MMAF prodrug structures. Dobmeier said that these prodrugs were "not a very active research area at Seattle Genetics, but including them within the amendment is a way to sell the financial terms internally to management so we can get this done." Dobmeier stated that SeaGen would agree to the payments proposed by Martin on July 29 if ASU agreed to include these prodrugs within the amendment.

On August 5, 2004, Martin emailed two ASU individuals, informing them that "we are in negotiation with Seattle Genetics to sign an amendment that says we don't have rights (and therefore won't receive royalties) on the three new compounds that Seattle Genetics developed," and "we've decided to sign an agreement that states ASU won't receive royalties or milestones based on the development of those 3 new compounds and the prodrug versions of those drugs."

On August 6, 2004, one of the ASU individuals relayed a response to Martin from Dr. Pettit that the proposed agreement was "a bad deal" and that they needed "a not to sue agreement with a 2% royalty and no decrease in the Seattle Genetics payments/year." The response also stated that "the new compounds are very close to auristatin E" and SeaGen had benefited from ASU's knowledge in the auristatin-dolastatin area.

Later on August 6, 2004, Dobmeier emailed to Martin a draft document titled "Amendment No. 3 to License Agreement." Dobmeier stated, "In addition to the terms we've discussed, you'll note that I've made a few clarifications/deletions in the amendment to account for the fact that the diligence clauses in Article 8 and the technical assistance provisions of Article 14 aren't applicable in the current context." Paragraph 1 of the Agreement section of this draft, which is same as in the final version of Amendment No. 3, states:

> ASU acknowledges and agrees that ASU's PATENT RIGHTS do not cover: (a) MMAE, MMAF and AFP (each as defined in Exhibit A); and (b) any prodrug forms of MMAE, MMAF and AFP (collectively, "SGI COMPOUNDS"). ASU acknowledges and agrees that the LICENSEE will not pay ASU any milestones or royalties with respect to products utilizing or incorporating SGI COMPOUNDS or any variants, analogues or derivatives thereof (collectively, "INDEPENDENT PRODUCTS").

On August 16, 2004, Martin responded to Dobmeier with a redlined document showing Martin's revisions to Dobmeier's draft. Martin said, "Our IP attorney is going to give the document one last look this afternoon." A few hours later, Martin emailed Dobmeier conveying feedback from the attorney, which noted three typographical errors and a discrepancy between the diagrams for MMAE, AFP, and MMAF in SeaGen's original proposal and those in the proposed Amendment No. 3. The attorney explained that by using straight lines instead of triangles, the proposed Amendment No. 3 defined the compounds MMAE, AFP, and MMAF, more broadly than the original proposal, which limited the compounds to a certain stereochemistry (*i.e.*, spatial arrangement of atoms and groups in molecules). Martin requested that Dobmeier correct the typographical errors and revise the diagrams to "exactly replicate the stereochemistry of the first document."

On August 17, 2004, Dobmeier emailed to Martin a redlined version of the proposed Amendment No. 3 showing the revisions they had discussed and a few additional corrections. Dobmeier requested that Martin provide specific authorization language, and a few minutes later Martin responded with language to be inserted. Shortly

- 11 -

thereafter, Dobmeier emailed to Martin a final execution copy of Amendment No. 3 and requested that Martin fax to him the page with ASU's signature.

### D. Amendment No. 3 to the License in 2004

Effective August 17, 2004, the parties executed "Amendment No. 3 to License Agreement," amending License Agreement No. 651-01.LLC dated February 3, 2000, as subsequently amended on February 18, 2000, and March 14, 2002. Amendment No. 3 provided that "all capitalized terms used but not defined herein" had the meanings set forth in the License as amended in 2000 and 2002.

Paragraph 1 of Amendment No. 3 stated:

> ASU acknowledges and agrees that ASU's PATENT RIGHTS do not cover: (a) MMAE, MMAF and AFP (each as defined in Exhibit A); and (b) any prodrug forms of MMAE, MMAF and AFP (collectively, "SGI COMPOUNDS"). ASU acknowledges and agrees that the LICENSEE will not pay ASU any milestones or royalties with respect to products utilizing or incorporating SGI COMPOUNDS or any variants, analogues or derivatives thereof (collectively, "INDEPENDENT PRODUCTS").

Paragraph 3 of Amendment No. 3 required SeaGen to pay ASU a one-time fee of $30,000 and increased the total of the annual maintenance fees due in 2005 through 2014 from $500,000 to $820,000. Paragraph 4 deleted SeaGen's due diligence and marketing obligations and ASU's technical assistance obligations. It also provided that requirements for milestone payments, earned royalties, and progress reports would "apply only to LICENSED PRODUCTS, and not INDEPENDENT PRODUCTS." Paragraph 5 of Amendment No. 3 provided that, except as otherwise expressly modified by Amendment No. 3, the License remained in full force and effect in accordance with its terms.

### E. Subsequent History

After 2004, the parties communicated occasionally regarding SeaGen's development of ADCETRIS, an anticancer drug that uses MMAE. In August 2011, SeaGen obtained accelerated FDA approval to market and sell ADCETRIS. In July 2013, the parties settled disputes pending before the Arizona Superior Court, American

Arbitration Association, and the U.S. District Court for the Western District of Washington. The settlement expressly did not affect ASU's ability to assert a claim of patent infringement or SeaGen's ability to assert defenses to such a claim. On March 31, 2014, ASU filed the present lawsuit alleging infringement of the Patent. The Patent expired in 2014.

## IV. ANALYSIS

If at all possible, a court must attempt to enforce a contract according to the parties' intent at the time the contract was made. *Taylor v. State Farm Mutual Auto. Ins. Co.*, 175 Ariz. 148, 152-53, 854 P.2d 1134, 1138-39 (1993). The court first considers evidence alleged to illuminate the meaning of the contract language or determine the parties' intent and then excludes extrinsic evidence that would vary or contradict the meaning of the written words of an agreement. *Id.* The court need not determine that the contract is ambiguous to consider extrinsic evidence. *Id.*

SeaGen contends that because ASU agreed SeaGen would not pay any royalties for using MMAE, ASU cannot sue SeaGen for royalties for using MMAE, and therefore SeaGen cannot be liable for infringement of the Patent by using MMAE. ASU contends it agreed SeaGen would not pay milestones and royalties *under the License* for using MMAE because Amendment No. 3 excludes MMAE from the License, but it did not waive compensation outside of the License for SeaGen's use of MMAE. Whether SeaGen can be held liable to ASU for infringement turns on whether ASU agreed to accept $850,000 in exchange for forgoing speculative future compensation related to MMAE or SeaGen agreed to pay $850,000 for no real benefit.

In March 2002, SeaGen agreed to pay ASU $50,000 to amend the License to postpone deadlines for three of SeaGen's development obligations and to reduce the royalty rate for sale of licensed products by SeaGen's sub-licensees. By 2004, SeaGen no longer was actively pursuing development of the licensed products and could have simply terminated the License. Instead, SeaGen offered ASU compensation in exchange

for certainty about using MMAE, which it believed was not protected by the Patent and not covered by the License.

In April 2004, SeaGen explained to ASU why it believed MMAE was not covered by the Patent and SeaGen would not owe ASU any compensation for MMAE products. SeaGen told ASU that rather than terminate the License, it would prefer to amend it to reduce SeaGen's annual fees and ensure that SeaGen would not pay ASU any milestones or royalties for MMAE. SeaGen's obligation to pay milestones and royalties for licensed products would continue unchanged. In May 2004, Martin of ASU described SeaGen's proposal as a "restructuring of the license agreement" because SeaGen was not developing the licensed products and instead was developing an improvement of the licensed products.

In June 2004, SeaGen provided ASU more information about its independent development of MMAE, and both parties' scientists and IP counsel discussed MMAE and its relationship to the licensed products. In July 2004, although ASU was unwilling to acknowledge that its patents do not cover MMAE, it described the question of patent coverage as "some remaining ambiguity regarding the claims coverage." During the exchange of drafts, the parties focused primarily on how much SeaGen was going to pay ASU in exchange for an "insurance policy." In August 2005, ASU's internal communications acknowledged it intended to sign an agreement stating it did not have rights to MMAE and would not receive royalties based on development of MMAE. Even if ASU believed there was more than "some remaining ambiguity" regarding whether the Patent covered MMAE, it knew that SeaGen obtaining FDA approval for a product using MMAE before the Patent expired in 2014 was unlikely. It would have been reasonable for ASU to choose guaranteed payments totaling $850,000 rather than gamble on the possible benefit of leaving "some remaining ambiguity" unresolved.

It also would have been reasonable for SeaGen to pay $850,000 to resolve any "remaining ambiguity" regarding whether ASU would seek compensation for SeaGen's use of MMAE. There is no evidence showing the parties intentionally used the term

1  "milestones and royalties" to protect SeaGen from any claim by ASU for payments under the License and to leave SeaGen vulnerable to infringement damages outside of the License. There also is no evidence showing SeaGen wanted to mislead its development partners by saying it had no obligation to pay ASU royalties related to MMAE "under the License," all the while knowing that ASU could demand compensation related to MMAE outside of the License. Finally, there is no evidence showing that SeaGen wanted to be relieved of its obligation to develop certain products while maintaining exclusive rights to those products to prevent competitors from developing those products.

Consideration of evidence extrinsic to Amendment No. 3 yields an interpretation that does not vary or contradict the meaning of the written words of Amendment No. 3. Amendment No. 3 states, "ASU acknowledges and agrees that the LICENSEE will not pay ASU any milestones or royalties with respect to products utilizing or incorporating SGI COMPOUNDS. . . ." Amendment No. 3's definition of "SGI COMPOUNDS" includes MMAE. Amendment No. 3 therefore plainly states that SeaGen will not pay ASU *any* royalties for its use of MMAE. It does not say "royalties under the License." It does not reserve any rights against SeaGen that ASU may have had under the License or the Patent regarding MMAE. It anticipates that SeaGen will develop and market products using MMAE and does not impose any obligation on SeaGen for doing so.

By executing Amendment No. 3, the parties entered a business deal intended to provide certainty. ASU obtained guaranteed revenue by forgoing potential income from an undeveloped product that may not have been covered by the Patent and likely would not achieve FDA approval before the Patent expired. SeaGen obtained certainty that it had no obligation to ASU beyond paying $850,000. The deal should have avoided costly litigation for both parties. Therefore, SeaGen's Motion for Summary Judgment will be granted.

## V.    REMAINING MOTIONS AND SEAGEN'S COUNTERCLAIM

The foregoing analysis resolves in SeaGen's favor the first issue ASU raised in its Motion for Partial Summary Judgment regarding the merits of SeaGen's license-based

defense and counterclaim. ASU's challenges to SeaGen's legal estoppel defense, waiver defense, counterclaim for breach of the implied covenant of good faith and fair dealing, laches and other delay-related defenses, equitable estoppel defense, and allegations of inequitable conduct are now moot. Therefore, ASU's Motion for Partial Summary Judgment (Docs. 293 (redacted), 299 (sealed)), will be denied.

The parties also have filed, in both sealed and redacted versions, ten motions to strike expert testimony, damages claims, and laches-related defenses. During oral argument, counsel for each party stated that these ten motions do not affect resolution of the summary judgment motions. All of these motions will be denied as moot.

In its counterclaim SeaGen seeks declaratory judgment that it has not infringed any claim of the Patent, declaratory judgment that the Patent is invalid, and determination that ASU breached the implied covenant of good faith and fair dealing. The counterclaim essentially restates SeaGen's defenses, which are moot upon granting SeaGen summary judgment. SeaGen also prematurely seeks determination that this is an exceptional case for award of attorney fees under 35 U.S.C. § 285. Consideration of any request for attorney fees will be made in accordance with the Fed. R. Civ. P. 54(d) and LRCiv 54.2.

IT IS THEREFORE ORDERED that SeaGen's Response to ASU's Supplemental Statement of Facts (Docs. 398 (redacted) and 416 (sealed)) is stricken as not authorized by the Rules of Practice of the U.S. District Court for the District of Arizona.

IT IS FURTHER ORDERED that Defendant Seattle Genetics, Inc.'s Motion for Summary Judgment (Docs. 256 (redacted), 310 (sealed)) is granted.

IT IS FURTHER ORDERED that ASU's Motion for Partial Summary Judgment (Docs. 293 (redacted), 299 (sealed)) is denied.

IT IS FURTHER ORDERED that all remaining pending motions in this case are denied as moot.

IT IS FURTHER ORDERED that Seattle Genetics' Counterclaim (Doc. 10) is dismissed as moot.

IT IS FURTHER ORDERED that the Clerk enter judgment in favor of Defendant and against Plaintiff and that Plaintiff take nothing. The Clerk shall terminate this case.

Dated this 4th day of August, 2015.

*[signature]*
Neil V. Wake
United States District Judge